536 S.E.2d 883

**Christopher J. HOLLAR, Respondent/Appellant,**

v.

**Hilaire M. HOLLAR, Appellant/Respondent.**

No. 3226.

Court of Appeals of South Carolina.

Heard June 1, 2000.

Decided July 24, 2000.

Deborah Wright, of Charleston, for appellant/respondent.

Robert N. Rosen, and Alexandra D. Varner, both of Rosen, Goodstein & Hagood, of Charleston, for respondent/appellant.

Guardian ad Litem: Georgia A. Shobe, of Mixon & Shobe, of Moncks Corner.

HEARN, Chief Judge:

These cross-appeals arise from a change of custody dispute between Christopher J. Hollar (Father) and Hilaire M. Hollar (Mother). Mother appeals from several aspects of the family court's order, including: (1) the court's finding Mother could retain primary custody of the parties' child only if she moves from Charlotte, North Carolina to Charleston, South Carolina; (2) the court's failure to increase Father's child support obligation in accordance with the Child Support Guidelines; (3) the court's failure to require Father to pay more than 50% of the guardian ad litem's fee; (4) the court's failure to award Mother attorney fees; and (5) the court's conditional requirement that Mother reimburse Father for temporary attorney fees and costs he paid during the pendency of litigation. Father appeals from the court's failure to award him sole custody of the child and challenges the court's award of guardian ad litem fees. We affirm in part, reverse in part, and modify.

## BACKGROUND FACTS & PROCEDURAL HISTORY

Father and Mother married in January 1988. They have one child, Laura, born on February 8, 1989. The parties were living in Charleston, South Carolina when they separated in January 1994.

Mother moved to Charlotte, North Carolina in April 1994. The parties agreed for Laura to continue to reside with Father in Charleston for the balance of the school year and to stay with Father throughout the summer. In August 1994, Laura moved to Charlotte with Mother. Father acquiesced in the move.

The parties entered into a settlement agreement on August 28, 1995. The agreement provided, *inter alia*, that the parties would share "joint legal custody" of Laura, with Mother exercising primary physical custody. The agreement did not specifically set forth a regular visitation schedule, with the exception of the following provision: "The minor child shall reside with the mother during the school year and for the month of July each year, and the minor child will reside with the Father each year from the time school is out until June 30, and for the month of August. The Parent with whom the minor child is NOT residing shall have the right to have the Child with him/her two to three weekends during the months that the minor child is residing with the other party." The agreement further provided Father would pay mother child support of $590.00 per month in accordance with the Child Support Guidelines. The parties were divorced by order of the family court approving and adopting the settlement agreement dated September 9, 1995.

In January 1996, Father petitioned the family court for a rule to show cause why the mother should not be held in contempt for making disparaging remarks about him in Laura's presence and for interfering with his visitation with the child. The family court issued a rule to show cause and held a hearing. By order dated April 6, 1996, the court found the evidence did not support a finding of contempt. However, with the consent of the parties, the court amended the visitation schedule to provide Father with visitation every other weekend.

Father married Cindy Swan (Stepmother) in April 1996. They reside in Mount Pleasant, South Carolina with Stepmother's two minor children from a previous marriage.

Father initiated this action against Mother in February of 1997, seeking sole custody of the child based on changed circumstances, child support, appointment of a guardian ad

litem, counseling for the child, and attorney fees and costs. To support his allegation of changed circumstances, Father alleged that since the original custody order, Mother had interfered with his physical and telephone visitation with the child, and left the child in a vehicle without supervision during business meetings. Father also asserted he could offer the child a more stable home due to his remarriage. Mother answered and counterclaimed, denying the father was entitled to a change of custody, and seeking, *inter alia,* an increase in child support and attorney fees and costs. On March 11, 1997, the family court issued a temporary order continuing custody with Mother.

On September 5, 1997, Father filed a supplemental complaint and motion seeking an emergency change in custody. In support of the motion, he alleged Mother had appeared at the home of Dr. Hollis Tidmore, a former boyfriend, with a pistol, had cut his telephone lines, and had engaged in other bizarre behavior. In a letter to the court, the guardian ad litem stated that based on information available to her at that time, she believed the change of custody should be granted. The family court issued an ex parte order granting the father temporary emergency custody and scheduling a hearing on the matter. After the September 9, 1997 hearing on the matter, the court issued an order granting temporary emergency custody to the paternal grandmother in Charlotte. Three days thereafter, the court returned custody to Mother, finding no clear evidence that the child was at risk with Mother. The court subsequently awarded Mother $4267.50 in temporary attorney fees and costs.

The final hearing was held over the course of seven days in November and December 1997 and January 1998. Prior to trial, Mother's counsel moved to limit the introduction of evidence and testimony to events occurring after the parties' divorce decree and order approving their custody agreement. The court declined to grant the motion, electing to make rulings on the introduction of evidence "on a case by case basis." Ultimately, despite periodic objections by Mother's counsel, both parties introduced an abundance of evidence relating to events which predated not only the divorce, but in numerous instances the marriage itself. While much of this evidence may have been relevant in a *de novo* custody hearing,

the issue before the court in this case was whether a substantial change of circumstances occurred after the date of the divorce decree which warranted a change of custody. The record on appeal is voluminous and contains much testimony which is irrelevant to this action for a change in custody. According, we have limited our consideration to evidence relating to events occurring after the parties' divorce.

Dr. James Allen Linderman began dating Mother in December 1994. They continued to date until April 1996. Linderman and Mother admitted that on one occasion, Linderman spent the night in the mother's home while the child was present. On that occasion, the child woke up in the night and came to Mother's bedroom door, which was closed. Mother heard the child approaching, arose, and took the child back to her own bedroom. The child did not see Linderman. After Mother put the child back to bed, Linderman dressed and left the home.

Mother began dating Dr. Hollis Tidmore in July 1996. In deposition, Tidmore testified he terminated his relationship with Mother in October of 1996, based in part on information he gleaned from conversations with Father and the pastor of the church in Charlotte he and Mother attended.[1] She thereafter began exhibiting bizarre behavior towards him. According to Tidmore, Mother followed him out of church, appeared uninvited at his home and at the hospital where he worked, cut his telephone lines at his home, and appeared at his home on one occasion carrying a pistol. Mother denied committing the alleged acts of harassment.

Father introduced evidence regarding Mother's work history. After moving to Charlotte, Mother was employed at four different jobs. At the time of trial, she had been employed at Sanger Clinic for approximately one year. Mother testified she enjoys her work at Sanger and plans to remain employed there. Moreover, her supervisor at Sanger testified that she

---

1. The pastor of father's church in Mt. Pleasant, Mother's former church, after consultation with Father and Stepmother, phoned the pastor of the church in Charlotte that Tidmore and Mother attended to inform the pastor that Mother had engaged in certain immoral behavior while a member of the church in Mt. Pleasant. The pastor in Charlotte related these allegations to Tidmore.

was a fine employee and the only problems with her performance have stemmed from the custody case.

By order dated May 11, 1998, the family court awarded sole custody of the child to Father, provided, however, that Mother could elect to retain joint custody if she chose to relocate to Charleston, South Carolina.[2] In so finding, the court reasoned that the primary change in circumstance was that the child was being negatively affected by the circumstances of the visitation arrangements. Specifically, the court found Mother had interfered with Father's visitation with Laura, the child does not like to travel, and the distance between her and Father is not "absolutely necessary." The court also expressed concern over Mother's job history and her judgment in allowing Linderman to spend the night in her home while the child was present. The court found that, although the child did not see Linderman on that occasion, "the mother's judgment with regard to Dr. Linderman could have harmed the child emotionally if she had seen the mother in bed with her pediatrician." The court all but dismissed the allegations concerning Tidmore, finding only that while the relationship unquestionably ended on poor terms, Mother was not at fault for this outcome. The court also found that Mother has no support system in Charlotte. The court ordered each party to pay his or her own attorney fees, with Mother to reimburse Father for $4267.50 in temporary fees paid during the pendency of litigation. As well, the court ordered each of the parties to pay an equal portion of the guardian ad litem's fee of $21,557.45.

Both Mother and Father filed post-trial motions for reconsideration. With the exception of allowing certain documentary evidence to be introduced into the record, and requiring the mother to repay the father for temporary fees only if she elected not to move to Charleston, the family court denied both motions. Thereafter, the mother petitioned the family

2. We note the family court sent two sets of "instructions" to the parties before rendering the final order. The first set of instructions found there was no change of circumstances and left custody with Mother. After correspondence with the parties, however, the family court issued a second set of instructions which were ultimately reflected in the final order.

court for supersedeas, which the court denied. This court granted Mother a supersedeas on August 5, 1998.

## STANDARD OF REVIEW

■ In appeals from the family court, this court has the authority to find the facts in accordance with its own view of the preponderance of the evidence. *Owens v. Owens,* 320 S.C. 543, 546, 466 S.E.2d 373, 375 (Ct.App.1996). This broad scope of review does not, however, require this court to disregard the findings of the family court. *Stevenson v. Stevenson,* 276 S.C. 475, 477, 279 S.E.2d 616, 617 (1981). Neither are we required to ignore the fact that the trial judge, who saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony. *Cherry v. Thomasson,* 276 S.C. 524, 525, 280 S.E.2d 541, 541 (1981).

## DISCUSSION

### I. Custody[3]

On appeal, Mother asserts the family court erred in finding a substantial change of circumstances sufficient to warrant a change of custody, whether or not the change was made conditional upon Mother's decision regarding relocation to Charleston. Father contends that he should have sole custody regardless of Mother's location. We agree with Mother that there has been no substantial change of circumstances warranting a change in custody.

■ In all child custody controversies, the controlling considerations are the child's welfare and best interests. *Cook v. Cobb,* 271 S.C. 136, 140, 245 S.E.2d 612, 614 (1978). In reaching a determination as to custody, the family court should consider how the custody decision will impact all areas of the child's life, including physical, psychological, spiritual, educational, familial, emotional, and recreational aspects. *Pountain v. Pountain,* 332 S.C. 130, 136, 503 S.E.2d 757, 760 (Ct.App.1998). Additionally, the court must assess each par-

---

**3.** For simplicity, we combine Mother's various arguments regarding the custody issue into a single discussion. Additionally, we necessarily deal with Father's appeal of the custody issue at this juncture.

ty's character, fitness, and attitude as they affect the child. *Id.* at 136, 503 S.E.2d at 760. Indeed, "the totality of circumstances peculiar to each case constitutes the only scale upon which the ultimate decision can be weighed." *Davenport v. Davenport,* 265 S.C. 524, 527, 220 S.E.2d 228, 230 (1975). In order for a court to grant a change of custody based on changed circumstances, the party seeking the change must meet the burden of showing changed circumstances occurring subsequent to the entry of the order in question. *Henggeler v. Hanson,* 333 S.C. 598, 602, 510 S.E.2d 722, 725 (Ct.App. 1998), *cert. denied* June 24, 1999; *Baer v. Baer,* 282 S.C. 362, 365, 318 S.E.2d 582, 583 (Ct.App.1984). "A change in circumstances justifying a change in the custody of a child simply means that sufficient facts have been shown to warrant the conclusion that the best interests of the child will be served by the change." *Skinner v. King,* 272 S.C. 520, 523, 252 S.E.2d 891, 892–93 (1979).

In finding changed circumstances, the family court focused primarily on problems with visitation, Mother's judgment with respect to Linderman, Mother's job history, and Mother's lack of a support system in Charlotte.[4]

## A. Mother's Interference with Visitation

■ In our view, the record simply does not demonstrate interference by Mother with Father's visitation sufficient to establish changed circumstances. The evidence presented indicates both parties share in the blame with regard to visitation and exchange problems. Each party has interfered with the other's access to the child at one time or another. Tellingly, Father has filed only one rule to show cause alleging such interference since the original decree. Moreover, the custody evaluator, Dr. Ronald Prinz, did not find Mother's interference substantial, nor did he find any damage to the relationship between Father and Laura as a result of actions by Mother. Prinz found both Mother and Father hostile, but

---

4. Father points to other evidence which he contends proves a change in custody is warranted. However, the events pointed to by Father were either given little merit by the family court in reaching its decision or were events which took place before the original decree and are thus irrelevant to a change of circumstances determination. Moreover, taking our own view of the evidence, we do not find the events clearly established by the evidence presented to the family court.

did not find either demonstrably more hostile than the other. Finally, the guardian ad litem testified that she thought Father would be less flexible regarding visitation with Mother if he had custody of Laura.

In *Allison v. Eudy,* 330 S.C. 427, 499 S.E.2d 227 (Ct.App. 1998), this court reversed a family court's finding of changed circumstances based on a father's interference with visitation by the mother. 330 S.C. at 429–30, 499 S.E.2d at 228–29. In doing so, we relied on the fact that the interference in that case did not adversely affect the child or amount to a "flagrant disregard of the prior order." 330 S.C. at 430, 499 S.E.2d at 229. In this case, there is likewise no showing of adverse effects on the child due to any interference. Furthermore, on the one occasion Father filed a rule to show cause, the family court did not find Mother's action amounted to contempt. As in *Allison,* we do not find the alleged interference in this case sufficient to warrant a change in custody.

## B. Negative Impacts of Travel on Child

■ The record indicates Laura does not enjoy traveling for visitation with Father. Our reading of the testimony convinces us that any problems the child may be experiencing in this regard stem mainly from stress, not the actual distance between the parents' homes. According to both the custody evaluator, Prinz, and Laura's physician, the child experiences stomachaches during visitation exchanges and during school tests. Prinz opined that both parents contributed in their own ways to Laura's stomach problems. Additionally, the guardian testified she did not think it was a good idea for Laura to move to Charleston, and she did not think living with Father would be a palliative for the problem. Laura's well-being, as evidenced by her "stomach problems," causes this court great concern. However, we do not believe the evidence establishes that Mother's behavior is the primary impetus for these problems. Moreover, the evidence shows that Laura's stomach problems escalated when Father filed this action for change of custody. Although it is impossible to shield the child from all stress factors, both parents bear some responsibility for exposing the child to the tensions between them. We entreat the parents to strive for greater cooperation and congeniality in dealing with visitation issues and exchanges.

A cooperative effort between the parents to refrain from exhibiting hostility towards each other would help to alleviate the child's discomfort.

Moreover, no change of circumstances can be established simply through reference to difficulties in visitation caused by the distance between Father's home and Mother's home, since the parties agreed to joint custody with primary custody being with Mother after the Mother's move to Charlotte. *See Henggeler*, 333 S.C. at 602, 510 S.E.2d at 725 (stating that circumstances warranting a change in custody must occur after the date of the original custody order).

### C. Mother's Employment History

As to Mother's employment history, we note that while Mother has held a number of employment positions since moving to Charlotte, there is no evidence she has undergone extended periods of unemployment. At the time of trial, Mother had been employed as an insurance claims processor at Sanger Cardiology Clinic for one year. Mother's supervisor testified Mother performs her work satisfactorily and the only problems she has experienced thus far have related to this custody action. Mother testified she enjoys her work and plans to remain employed at the company.[5] The record demonstrates Mother's consistent employment, and there is no indication that she has not provided adequately for Laura at all times. Moreover, there is no evidence that Mother's changes in employment have impacted negatively on Laura.

### D. Mother's Lack of a Support System in Charlotte

While the family court found Mother lacks a support system in Charlotte, we do not believe that moving to Charleston would provide her with a better support system. Mother has no family in Charleston. In Charlotte, Mother enjoys the support and companionship of various friends and associates from her church and neighborhood. She has established relationships at her pale of employment and is familiar with the child's teacher and pediatrician. As well, the paternal grandmother and other members of Father's family live in

---

5. At oral argument, Mother's counsel indicated Mother remains employed at Sanger.

Charlotte, where Mother currently resides. Although Mother's relationship with the paternal grandmother has become strained due to these proceedings, the paternal grandmother testified she and Mother were close in the past and that she stills loves Mother.

We are not persuaded the Mother could establish a better support system by moving to Charleston and being in closer proximity to Father and Stepmother. Mother's relationship with Father and Stepmother has become progressively more troubled. In an effort to gain custody of the child, Father and Stepmother have involved not only their own minister, but Mother's minister in Charlotte as well. As a result of conversations with Father's minister, Mother's minister advised Tidmore to terminate his relationship with Mother. Father also had numerous conversations with Tidmore regarding Mother's behavior during the marriage. In addition, Father and Stepmother have called North Carolina's social services department on at lest two occasions to make unsubstantiated allegations of abuse against Mother. It is difficult to conceive how placing Mother and Father in the same community will be beneficial to anyone's interests.

### E. Linderman Incident

The family court questioned Mother's judgment in allowing Linderman to spend the night on one occasion. It is undisputed, however, that the child did not know Linderman was present. The family court merely found that Laura could have been emotionally harmed if she had seen Linderman and Mother in bed together. While Mother clearly suffered a lapse in judgment in allowing Linderman into her bed while the child was in the home, the record is devoid of evidence of any impact on the child whatsoever. We recognize that the burden of proving changed circumstances does not necessarily require the moving party to show an existing physical or emotional injury to the child. *See Routh v. Routh,* 328 S.C. 512, 520, 492 S.E.2d 415, 419 (Ct.App.1997). Were there evidence of repeated lapses of judgment in this regard on Mother's part, the potential impact on the child's welfare may be of concern. However, we are not persuaded this isolated incident is sufficient to warrant a change in custody. *See Dent v. Dent,* 273 S.C. 387, 390, 256 S.E.2d 743, 745 (1979)

(finding sexual relationship of wife with at least one other man subsequent to divorce an isolated occurrence and insufficient moral laxity to affect the welfare of the children such as to warrant a change in custody); *cf. Clear v. Clear*, 331 S.C. 186, 191–92, 500 S.E.2d 790, 792 (Ct.App.1998) ("[T]he effect which a parent's morality may have on his or her fitness to have custody is limited to what relevancy it has, either directly or indirectly, to the welfare of the child. Moreover, custody is not to be used to penalize or reward a parent for his or her conduct.") (citations omitted).

In our view, the record simply does not establish a change of circumstances occurring since the entry of the parties' divorce decree which would justify a change of custody to the father. Neither the custody evaluator nor the guardian ad litem found a change of circumstances. The record does not establish that either a change of custody or relocation to Charleston would be in the best interest of the child. This is particularly true given that the child has resided with Mother in Charlotte for the past six years and appears to be well adjusted, closely bonded to Mother, and excelling in school and extracurricular activities.[6]

## II. Child Support

The mother also asserts the court erred in failing to grant her an increase in child support in accordance with the Child support Guidelines. Although the family court's decision on this issue was no doubt affected by her determination of the custody issue, we also decline to increase Father's current child support payment. Father has fairly extensive visitation with the child, and bears a greater burden of the travel expense related to that visitation.

### III. Fees and Costs

### A. Attorney Fees and Costs

Next, Mother argues the family court erred in failing to award her attorney fees and costs. Mother also argues she should not have to reimburse Father for temporary attorney

---

6. Laura's report cards and "Daily Reading Record" from her school in Charlotte establish that she is doing very well academically. Additionally, Laura enjoys playing soccer and singing.

fees and costs awarded during the pendency of the litigation. We agree.

The decision whether to award attorney fees is within the sound discretion of the family court, the exercise of which will not be overturned absent a showing of abuse. *Stevenson v. Stevenson,* 295 S.C. 412, 415, 368 S.E.2d 901, 903 (1988). In awarding attorney fees, the court should consider the parties ability to pay their own fee, the beneficial results obtained by the attorney, the parties' respective financial conditions, and the effect of the fee on each party's standard of living. *E.D.M. v. T.A.M.,* 307 S.C. 471, 476–77, 415 S.E.2d 812, 816 (1992). In determining the amount of attorney fees to award, the court should consider the nature, extent, and difficulty of the services rendered, the time necessarily devoted to the case, counsel's professional standing, the contingency of compensation, the beneficial results obtained, and the customary legal fees for similar services. *Glasscock v. Glasscock,* 304 S.C. 158, 161, 403 S.E.2d 313, 315 (1991).

Consistent with our decision to continue custody with Mother, the application of the above factors warrants an award of attorney fees to Mother. Moreover, we will not require Mother to reimburse Father the total amount of temporary fees awarded during the litigation. Mother incurred $36,053.18 in attorney fees and costs, an amount considerably less than the $118,588.75 in attorney fees and costs incurred by the father. The trial of this action was unnecessarily lengthened when Father persisted, over Mother's objection, in introducing substantial evidence which predated the original custody decree. Under the facts and circumstances of this case, particularly the mother's successful appeal of the action and the father's superior income,[7] we find an award to Mother of fifty percent (50%) of her attorney fees is warranted. Father is therefore ordered to pay Mother $15,892.84 for fees and costs incurred in connection with this litigation. This figure represents fifty percent of $36,053.18 minus fifty percent of the $4267.50 in temporary fees which the family court ordered Mother to reimburse.

7. Father earns $5166 per month. Mother earns $1820 per month.

## B. Guardian Ad Litem Fees and Costs

 Mother next argues the court erred in failing to order Father to pay a pro rata share, rather than an equal share, of the guardian ad litem's fees and costs. Father, on the other hand, asserts the fees were excessive.[8]

 An award of guardian ad litem fees lies within the sound discretion of the trial judge and will not be disturbed on appeal absent an abuse of discretion. *Nash v. Byrd,* 298 S.C. 530, 537, 381 S.E.2d 913, 917 (Ct.App.1989). The same equitable considerations which apply to attorney fees also apply to costs. *Garris v. McDuffie,* 288 S.C. 637, 644, 344 S.E.2d 186, 191 (Ct.App.1986).

We reject Father's contention the guardian's fees were excessive. The guardian spent in excess of 230 hours performing her duties in connection with this litigation. This is not an excessive amount of time considering the ongoing conflict between the parties, travel time, and the numerous witnesses involved in the seven day trial of this case. Additionally, we do not find the guardian's $100 per hour fee excessive, particularly in light of the guardian's professional standing and the attorney fees incurred by the parties to this litigation.

 Because we feel both parties share the blame for the guardian's time and effort expended in this case, we decline to alter the family court's fifty-fifty allocation of the burden of paying the guardian's fee.

---

8. At the close of the trial, the family court asked how the parties wished to proceed on determining the guardian's fees. Father's counsel responded: "Well, she just needs to submit a statement. I don't think any of us here are going to question the—her hours or rate. I haven't seen it, I—but I—generally, the lawyers we work with, I think, we submit truthful statements." In his motion for reconsideration, however, Father argued that the guardian's fee of $100 per hour was excessive. In brief and at oral argument before this court, Father's counsel made additional arguments about the guardian ad litem system, including the use of attorney guardians. While this court appreciates his concerns, these arguments were not raised to the family court and are therefore not within our purview. *See McDavid v. McDavid,* 333 S.C. 490, 497, 511 S.E.2d 365, 368–69 (1999). Moreover, Father's prior counsel and Wife's counsel did not object to the appointment of the guardian in this case. Thus, Father cannot be heard to challenge the selection of an attorney guardian in this case.

For the foregoing reasons, the decision of the family court is

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

ANDERSON and HUFF, JJ., concur.