682 S.E.2d 843

**Diana SPREEUW, Respondent/Appellant,**

v.

**Douglas BARKER, Appellant/Respondent.**

**No. 4602.**

Court of Appeals of South Carolina.

Heard March 5, 2009.

Decided July 29, 2009.

46

48

Gregory S. Forman, of Charleston, for Appellant/Respondent.

Russell S. Stemke, of Isle of Palms, for Respondent/Appellant.

HEARN, C.J.:

This is a protracted custody suit where an order issued in 2002 is only just now being reviewed on appeal.

## FACTS

During their ten-year marriage, Diana Spreeuw (Mother) and Douglas Barker (Father) lived in Charleston and had two children: Daryn, born January 1, 1990, and Dylan, born March 20, 1997. Mother, the family's primary breadwinner, worked in the field of health-care finance, while Father worked as an attorney. After the birth of the parties' second child, their marriage began deteriorating. To further complicate matters, Mother learned her employer, the last remaining health-care provider with financial operations in the area, would soon leave Charleston for Nashville. Mother immediately began searching for comparable employment in the area; however, her efforts were unsuccessful.[1] Soon thereafter, on June 25, 1999, Father commenced a divorce action.

Prior to the divorce hearing, Mother and Father reached an agreement regarding custody and child support. With her oldest child expressing a desire to finish elementary school in Charleston and no employment opportunities in the area, Mother agreed to give Father primary custody of the children, while sharing joint legal custody with him. In addition, Mother agreed to pay Father $1,000 in child support per month. Meanwhile, Mother accepted the closest employment opportunity available in Nashville. The parties were divorced and the agreement was approved by order of the family court dated December 17, 2001.

Following the divorce, Mother moved to Nashville to begin her job. While there, she routinely sent letters to the children and called them daily. Approximately two months later, Father married Daphne Burns. Thereafter, Daphne began living with Father and the children in Charleston. Daphne

---

1. The specialization required in her field of health-care finance did not translate to other finance positions.

described her time in the house as filled with "tension, anger, and ugliness." Six months after moving in, Daphne moved out of the house. Over the next year, Daphne moved back into the house on two occasions only to permanently move out of the house in the spring of 2001.[2] Jo Marie Hartman, a neighbor of Father, telephoned Mother and informed her of Daphne's permanent departure from the home. Mother called Father and expressed concern about the impact the move would have on the children.

A few months later, the children arrived at Mother's house for summer visitation. While there, her oldest child begged Mother to return to Charleston. In June 2001, Mother decided to return to Charleston and called Father to inform him of her decision. Shortly thereafter, Mother placed her home in Nashville on the market and began searching for employment. In contemplation of her return, Father scheduled a mediation session to revisit the existing visitation schedule. For some unknown reason, the mediation never took place, and the current visitation schedule remained in effect.

By September, Mother still had not sold her house and had failed to find comparable employment in the Charleston area. Nevertheless, Mother, believing her children needed her, took the first job she could find and moved into a friend's house on Daniel Island.[3] Mother, who earned $74,000 a year in Nashville, was then working in a fabric store earning $6.50 an hour. Mother supplemented her income by substitute teaching at local schools for $50 a day. All the while, Mother continued her search for a financial management position in the area She solicited the service of head-hunting agencies, sent out numerous job applications, looked through employment advertisements in the newspaper, and networked with friends in search of employment. Eventually, Mother accepted a position as an accounts receivable clerk with RoHoHo Incorporated, a franchisee of Papa John's Pizza, earning $26,000 per year.

A month after Mother's return to Charleston, Father still

---

2. Despite Daphne's transient living arrangement, the children maintained a "very close" relationship with her.

3. Mother bought her own home approximately a month later.

refused to amend the existing visitation schedule.[4] On October 31, 2001, Mother filed a complaint against Father seeking a change in custody and modification of child support. At the temporary hearing, Father alleged his monthly income was $3,600 per month, while Mother indicated her monthly income was $903.59. The Honorable F.P. Segars–Andrews issued a temporary order granting Mother overnight visitation with the children every Wednesday night and on alternating weekends. In addition, Mother's child support payments were reduced from $1,000 to $500 per month.

In October of 2001, Father commenced a romantic relationship with Jennifer Helm. As the relationship progressed, Jennifer began spending more and more time at Father's home with the children present. On some occasions, Father acknowledged Jennifer stayed past the children's bedtime. According to the testimony of Mother and the Guardian ad Litem ("Guardian"), the parties' oldest child did not like Jennifer and felt uncomfortable with her in the house. By contrast, Father testified that his children loved Jennifer.

The parties' lives remained virtually unchanged until August 6, 2002 when Father, pursuant to the parties' prior understanding, picked up the children from Mother's house at 9:00 A.M. to take their oldest child to register for school. By the time Father arrived at Mother's residence, she had already departed for work, and the children, ages twelve and five, were alone. However, the children were provided with a list of names and telephone numbers of nearby neighbors they could contact in case of an emergency. After arriving at Mother's house, Father immediately called Mother and informed her he was keeping the children for the remainder of the day. Father also attempted to contact the Guardian, who was unable to take his phone call at the time. Thereafter, Father visited his attorney's office and instructed him to prepare a motion for an ex parte order. In his motion, he alleged "the children were to be left alone all day while

---

4. Under the 1999 order, visitation consisted of monthly weekend visitations and longer periods of visitation during the summer and on school vacations. The 1999 order did not include a normal weekly sharing of custody between the parties due to the distance between their residences.

[Mother] was at work."[5] On that same day, Judge Segars–Andrews issued an emergency ex parte order preventing the children from being left home alone.

A mere five days before the parties' September 10, 2002 trial date, Father, on his own initiative and without prior notice or approval, took the children to the office of Dr. Barton Saylor, a forensic psychologist, to be assessed and interviewed. From his interview with the children, Dr. Saylor concluded that the children were well-adjusted and did not display any significant emotional problems. At trial, Dr. Saylor made it clear that he did not conduct a custody evaluation or make a comparison of the parents.

Prior to trial, the Guardian submitted her written report to both parties. The Guardian's written report was the culmination of a five-month investigation of the family, consisting of numerous interviews, observations, and in-home visits.[6] The Guardian did not submit a recommendation regarding custody of the children in her report. Instead, the Guardian, through her attorney, informed the court she wished to reserve the right to make a custody recommendation at the conclusion of the testimony. At that time, the Guardian orally recommended that primary custody of the children be awarded to Mother. The Guardian based her recommendation on numerous factors including: the oldest child's stated preference to live with Mother; Father's refusal to allow Mother to share in parental decisionmaking; Father's testimony that Mother should not have more time with the children beyond the existing visitation schedule; the children's disposition while in the care of both parties; and her concerns about the impact Father's relationship with Jennifer had on the children.

At the end of trial, the family court issued an order modifying custody and child support. The court's order awarded the parties joint physical custody, designated Mother as the pri-

---

5. Father had not discussed with Mother what plans she had for the children after school registration. Therefore, his statement that they were to be left alone "all day" is speculative. However, it is accurate to say the children were left alone for about an hour from the time Mother left for work until Father picked up the children.

6. Although the Guardian requested that both parties provide her with a written list of witnesses to interview, neither party did so.

mary physical custodian, and granted her final decision-making authority. In addressing the child support issue, the family court declined to impute income to Mother, finding she was not voluntarily underemployed due to her leaving a high-paying job in Nashville to return to Charleston. Next, the court determined the amount of money Father withdrew from his law firm in 2001 represented only 80% of his total income for that year as reported in his income tax return.[7] Therefore, when Father alleged he withdrew $6,000 per month in 2002, the family court, operating under the assumption that this amount represented only 80% of his gross income, concluded Father's income for 2002 equaled $7,500 per month (80% of $7,500 = $6,000). Then, the family court determined Father improperly included $1,474.47 of items as expenses that should have been reported as part of his gross monthly income in his financial declaration. As a result, the family court concluded Father earned $8,974.47 per month for child support purposes and required him to pay $804 per month in child-support to Mother. Lastly, the family court ordered Father to pay Mother $43,675 in attorney's fees and costs in light of the vigorous defense asserted by him and the beneficial results obtained by Mother.

Thereafter, both parties filed motions to alter or amend the judgment. Before the court could rule on the motions, Father also filed a motion for relief from judgment based on newly discovered evidence. The family court denied both parties' motions to alter or amend the judgment on February 28, 2002. Father filed a notice of appeal on March 13, while Mother filed a notice of appeal on March 27. On April 7, the family court denied Father's motion for relief from judgment based on newly discovered evidence. Subsequently, Father filed a second notice of appeal on April 11. On May 8, Court of Appeals Judge Cureton issued an order consolidating Father's two appeals.

After trial, this case encountered many delays during its almost seven year journey to our docket. Immediately following the family court's order, Father sought a determination

---

7. At trial, Father admitted withdrawing $53,000 from his law firm in 2001. By contrast, his 2001 corporate income tax return reported his income for the year equaled $66,372.

from the United States Bankruptcy Court as to whether the family court's award of attorney's fees should be designated as a priority debt. This case was stayed until 2005 during the pendency of the bankruptcy proceedings. From there, the parties and their counsel managed to delay resolution of this case even further by filing more than twenty-five motions with this court.

## STANDARD OF REVIEW

In an appeal from the family court, this court may correct errors of law and find facts in accordance with its own view of the preponderance of the evidence. *Semken v. Semken*, 379 S.C. 71, 75, 664 S.E.2d 493, 496 (Ct.App.2008). We are not, however, required to ignore the fact that the trial judge, who saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony. *Marquez v. Caudill*, 376 S.C. 229, 239, 656 S.E.2d 737, 742 (2008). In particular, an appellate court should be reluctant to substitute its own evaluation of the evidence on child custody for that of the family court. *Woodall v. Woodall*, 322 S.C. 7, 10, 471 S.E.2d 154, 157 (1996).

## LAW/ANALYSIS

### I. TIMELINESS OF MOTHERS APPEAL

Father argues Mother did not timely file her motion to alter or amend the final order pursuant to Rules 52 and 59(e), SCRCP. Assuming the motion was timely filed, Father contends Mother failed to timely file a notice of appeal. We disagree.

Father's arguments are wholly without merit and warrant little discussion. First, Mother timely made her Rule 59(e) motion by serving Father ten days after receiving notice of the judgment. *See* Rule 59(e), SCRCP ("A motion to alter or amend the judgment shall be *served* not later than 10 days after receipt of written notice of the entry of the order.") (emphasis added). Second, because Mother timely made a motion pursuant to Rule 59(e), the time to serve her notice of appeal did not run until she received written notice of the order granting or denying that motion. *See* Rule 203(b)(1),

58

SCACR (noting if a party makes a timely Rule 59 motion, the time for appeal is stayed and does not begin to run until the receipt of written notice of the order granting or denying such motion). Therefore, Mother had thirty days to file a notice of appeal after receiving written notice of the order denying her Rule 59(e) motion. *Id.* Because she served her notice of appeal within the thirty day time period, her notice of appeal was timely.

## II. CUSTODY

### A. *Final Decision–Making Authority*

Father asserts the family court erred in awarding final decision-making authority to Mother. According to Father, the family court misconstrued the previous order as silent on the issue of final decision-making authority. Father claims the previous order implicitly granted him final decision-making authority when it granted him primary custody.

 Unless otherwise stated by agreement of the parties or order of the family court, the power to make final decisions for children is necessarily vested in the custodial parent. Thus, Father correctly points out that the previous order implicitly granted him final decision-making authority by virtue of granting him primary legal custody. Accordingly, the family court misconstrued the previous order when it stated that it was silent as to final decision-making authority. Nevertheless, the family court awarded Mother primary legal custody based on a finding of a substantial change in circumstances. Therefore, the fact that the family court misconstrued the previous order makes no difference on appeal because the change in primary legal custody, and with it the grant of final decision-making authority, was predicated on a finding of a substantial change in circumstances, not on an interpretation of the previous order. *See McCall v. Finley*, 294 S.C. 1, 4, 362 S.E.2d 26, 28 (Ct.App.1987) ("[W]hatever doesn't make any difference, doesn't matter."). Accordingly, the family court did not err in awarding final decision-making authority to Mother.

## B. *Primary Legal Custody*

█ Father argues the family court erred in awarding primary legal custody of the children to Mother, asserting the family court failed to consider or improperly considered a number of factors in the best interests of the child analysis. Specifically, Father contends the court erred by: determining he excluded Mother from the decision-making process when he held final decision-making authority; failing to take into account Mother left the children alone at home; relying on the report and recommendation of the Guardian; and considering the preference of the oldest child.[8] Lastly, Father alleges his decision-making for the children was proper, and they were doing very well in his care. We disagree.

██ The paramount and controlling consideration in a custody dispute is the best interests of the child. *Cole v. Cole,* 274 S.C. 449, 453, 265 S.E.2d 669, 671 (1980). The family court must consider the character, fitness, attitude, and inclinations on the part of each parent as they affect the child. *Hollar v. Hollar,* 342 S.C. 463, 472–73, 536 S.E.2d 883, 888 (Ct.App.2000). Psychological, physical, environmental, spiritual, educational, medical, family, emotional, and recreational aspects of the child's life should also be considered. *Wheeler v. Gill,* 307 S.C. 94, 99, 413 S.E.2d 860, 863 (Ct.App.1992). In sum, the totality of circumstances unique to each particular case constitutes the only scale upon which the ultimate decision can be weighed. *Paparella v. Paparella,* 340 S.C. 186, 189, 531 S.E.2d 297, 299 (Ct.App.2000).

█ In order for a court to grant a change in custody, the moving party must demonstrate changed circumstances occurring subsequent to the entry of the order in question. *Kisling v. Allison,* 343 S.C. 674, 679, 541 S.E.2d 273, 275 (Ct.App.2001). A change in circumstances justifying a change in the custody of a child simply means that sufficient facts have been shown to warrant the conclusion that the best interests of the children would be served by the change. *Shirley v. Shirley,* 342 S.C. 324, 330, 536 S.E.2d 427, 430

---

8. We note that Father's argument concerning the family court's reliance on the Guardian's report and recommendation is not preserved for appellate review. This issue is addressed directly under the "Fees" section of this opinion.

(Ct.App.2000). "The change of circumstances relied on for a change of custody must be such as would substantially affect the interest and welfare of the child." *Latimer v. Farmer*, 360 S.C. 375, 381, 602 S.E.2d 32, 35 (2004).

The family court awarded primary legal custody of the children to Mother based on a finding of a substantial change in circumstances. In making this finding, the family court determined the best interests of the children would be served by awarding primary legal custody to Mother. For the reasons set forth below, we believe the family court properly considered the best interests of the children in awarding primary legal custody to Mother.

■■■ Initially, even though the previous order granted Father final decisionmaking authority, this power did not excuse him from the responsibility of co-parenting with Mother. Therefore, this was a relevant inquiry in the court's analysis. Contrary to Father's assertions, the family court recounted the episode where the children were left alone while in Mother's care in great detail. We decline to assign additional weight to this incident on appeal as the record merely indicates the children were left alone for a short period of time while they waited for their Father to pick them up. Next, the family court properly considered the oldest child's stated preference to live with Mother in performing the best interests analysis. *See Brown v. Brown*, 362 S.C. 85, 93, 606 S.E.2d 785, 789 (Ct.App.2004) ("In determining the best interests of the child, the court must consider the child's reasonable preference for custody."). At the time of trial, the parties' oldest child was nearly thirteen years-old and by all accounts very mature for her age. Accordingly, the family court properly attached significance to her wishes in awarding custody to Mother. *See Smith v. Smith*, 261 S.C. 81, 85, 198 S.E.2d 271, 274 (1973) ("The significance to be attached to the wishes of the child in a custody dispute depends upon the age of the child and the attendant circumstances.").

Lastly, Father alleges his decision-making for the children was proper, and they were doing very well in his care. However, the record reveals Father made many decisions to advance his own interests without regard to how they affected the children. For example, Father continually allowed his

girlfriend, Jennifer, to come to his home while the children were there even though this disturbed the oldest child. In addition, he allowed Jennifer to stay at his house past the children's bedtime. Thus, while the children were doing well in school and healthy while in Father's care, we find that the family court properly considered their best interests in awarding primary legal custody to Mother.

## C. *Physical Custody*

On cross-appeal, Mother argues the family court erred in awarding both parties joint physical custody of the children without making a finding of extraordinary circumstances. Mother contends it would be in the best interests of the children for sole physical custody to be awarded to her. We disagree.

The family court, although awarding both parties joint physical custody, failed to make a finding of exceptional circumstances to support its decision. *See Patel v. Patel*, 359 S.C. 515, 528, 599 S.E.2d 114, 121 (2004) (noting joint custody should only be ordered under exceptional circumstances); *Courie v. Courie*, 288 S.C. 163, 168, 341 S.E.2d 646, 649 (Ct.App.1986) ("Divided custody is avoided if at all possible, and will be approved only under exceptional circumstances."). Absent exceptional circumstances, the law regards joint custody as typically harmful to the children and not in their best interests. *Scott v. Scott*, 354 S.C. 118, 125, 579 S.E.2d 620, 624 (2003).

We believe the exceptional nature of this case demands that we affirm the family court's award of joint physical custody. In this case, a seven year delay occurred between the issuance of the family court's final order, dated December 19, 2002, and oral argument before this panel on March 5, 2009. The reasons for the delay in this case range from the acceptable—Father's bankruptcy proceeding—to the unacceptable—the rash of motions filed by both parties. Since the family court's final order, the children have grown from the ages of five and twelve to the ages of twelve and nineteen. Undoubtedly, many things have changed in the children's lives since 2002. However, the custodial arrangement has remained constant. At this point, we are reluctant to order a change in the

custody arrangement based on a record which most certainly has become cold. Accordingly, we affirm the family court's decision to award both parties joint physical custody of the children.

## III. SUPPORT

### A. *Imputing Income to Mother*

■ Father argues Mother voluntarily left a job earning $74,000 in Nashville for a low-paying job in Charleston. As a result, Father contends the family court erred in refusing to impute income to Mother. If the court refuses to impute income to Mother based on a finding of voluntary underemployment, Father alleges Mother's income should be increased to reflect the raise she received from her employer, RoHoHo, Inc. We disagree.

■ "If the court finds that a parent is voluntarily unemployed or underemployed, it should calculate child support based on a determination of potential income which would otherwise ordinarily be available to the parent." ˙S.C.Code Ann. Regs. 114–4720(A)(5) (Supp.2008). A parent seeking to impute income to the other parent need not establish a bad faith motivation to prove underemployment. *Arnal v. Arnal,* 371 S.C. 10, 13, 636 S.E.2d 864, 866 (2006). However, the motivation behind any purported reduction in income or earning capacity should be considered in determining whether a parent is voluntarily underemployed. *Id.* "[T]he common thread in cases where actual income versus earning capacity is at issue is that courts are to closely examine the payor's good-faith and reasonable explanation for the decreased income." *Kelley v. Kelley,* 324 S.C. 481, 489, 477 S.E.2d 727, 731 (Ct.App.1996).

■ A trial court may relieve a party from a final judgment, order, or proceeding based on newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b). Rule 60(b)(2), SCRCP. The motion must be made within a reasonable time and not more than one year after the judgment was entered. Rule 60(b), SCRCP. To obtain relief based on newly discovered evidence, a movant must establish that the

newly discovered evidence: (1) is of such magnitude that had the court known of it earlier, the outcome would likely have been different; (2) has been discovered since the trial; (3) could not have been discovered before the trial; (4) is material to the issue; and (5) is not merely cumulative or impeaching. *Lanier v. Lanier*, 364 S.C. 211, 217, 612 S.E.2d 456, 459 (Ct.App.2004).

The trial court did not err in refusing to impute income to Mother. The overwhelming evidence reveals the motivating factor prompting Mother's resignation from her job in Nashville was the wishes of the parties' oldest child. *See Kelley*, 324 S.C. at 489, 477 S.E.2d at 731 (noting courts should consider the parties' good-faith and reasonable explanation for the decreased income in determining whether to impute income to the party). Immediately prior to summer visitation with Mother, the children endured a traumatic episode when Father's third wife, Daphne Burns, permanently moved out of Father's residence. Thereafter, upon arriving in Nashville, the parties' oldest child begged Mother to return to Charleston, and Mother did so. Once she returned to Charleston, Mother found her employment opportunities in the field of health-care finance remained non-existent in the Charleston area. Because of this, Mother earns significantly less in Charleston than she earned in Nashville. Nonetheless, before arriving in Charleston and up to the time of trial, Mother searched and continued searching for a financial management position in the area by soliciting the service of head-hunting agencies, sending out numerous job applications, looking through employment advertisements in the newspaper, and networking with friends. Based on these facts, we conclude that Mother was not voluntarily underemployed. Consequently, we do not believe the family court erred in refusing to impute income to Mother.

In addition, we do not believe the family court erred in denying Father's motion to increase Mother's income from $26,000 to $31,200 based on newly discovered evidence. We believe Father could have, through the exercise of due diligence, discovered Mother's raise in time to move for relief pursuant to Rule 59. *See* Rule 60(b)(2), SCRCP (stating a party cannot obtain relief from a final judgment based on newly discovered evidence if the evidence could have been

discovered through the exercise of due diligence in time to move for a new trial under Rule 59(b)); *Lanier*, 364 S.C. at 220, 612 S.E.2d at 460 (defining due diligence as "the diligence reasonably expected from, and ordinarily exercised by, a person who seeks to satisfy a legal requirement or to discharge an obligation."). In this case, the trial ended on September 22, 2002. In November 2002, Mother received a raise from her employer. On December 19, 2002, the family court issued its amended final order. Thus, the evidence of Mother's raise was in existence during the time period in which Father could have sought relief pursuant to Rule 59. *See* Rule 59(b), SCRCP (noting in non-jury actions, a party has ten days after the receipt of written notice of the entry of judgment to serve a motion for a new trial). On appeal, Father fails to offer any reason why Mother's raise could not have been discovered during this time. In fact, on January 17, 2003, Father ultimately discovered Mother's raise by subpoena of loan documents prepared by Mother in November 2002. Therefore, the family court properly denied Father's motion for relief from judgment based on newly discovered evidence.[9] *See State v. Mercer*, 381 S.C. 149, 166, 672 S.E.2d 556, 565 (2009) (noting our jurisprudence recognizes the gatekeeping role of the trial court in determining the credibility of post-trial motions); *State v. Pierce*, 263 S.C. 23, 33, 207 S.E.2d 414, 419 (1974) ("The credibility of newly-discovered evidence offered in support of a motion for new trial is a matter for determination by the circuit judge to whom it is offered.").

## B. *Imputing Income to Father*

 The family court concluded Father earned $7,500 per month in gross income, exclusive of additions for in-kind benefits received by Father. Father asserts the family court committed several errors in arriving at this figure. First, because his income varies from month to month, Father alleges the family court erred by using his highest-ever eight month income, the $6,000 a month he withdrew from his law practice in 2002, as a base-line figure for its child support

---

9. In his Rule 60(b)(2) motion, Father also sought relief from judgment because Mother moved from her residence and continued to leave the children alone at home. We believe the family court acted within its discretion in refusing to grant Father relief on these grounds.

calculations. Instead, Father asserts his income should have been averaged over a longer period of time. Additionally, Father claims the family court erred in determining the $6,000 per month he withdrew from his law firm in 2002 represented only 80% of his gross income for that year. According to Father, this error caused the family court to conclude his gross income equaled $7,500 per month (80% of $7,500 = $6,000).

"Child support awards are within the sound discretion of the trial judge and, absent an abuse of discretion, will not be disturbed on appeal." *Mitchell v. Mitchell*, 283 S.C. 87, 92, 320 S.E.2d 706, 710 (1984). An abuse of discretion occurs when the court's decision is controlled by some error of law or where the order, based upon the findings of fact, is without evidentiary support. *Kelley*, 324 S.C. at 485, 477 S.E.2d at 729. Ordinarily, the family court determines income based upon the financial declarations submitted by the parties. S.C.Code Ann. Regs. 114–4720(A)(6) (Supp.2008). However, where the amounts reflected on the financial declaration are at issue, the court may rely on suitable documentation to verify income, such as pay stubs, receipts, or expenses covering at least one month. *Id.* The Child Support Guidelines specifically address how to determine income from someone who is self-employed:

> For income from self-employment ... gross income is defined as gross receipts minus ordinary and necessary expenses required for self-employment or business operation.... However, the court should exclude from those expenses amounts allowed by the Internal Revenue Service for accelerated depreciation of investment tax credits for purposes of the guidelines and add those amounts back in to determine gross income. In general, the court should carefully review income and expenses from self-employment ... to determine actual levels of gross income available to the parent to satisfy a child support obligation. As may be apparent, this amount may differ from the determination of business income for tax purposes.

S.C.Code Ann. Regs. 114–4720(A)(4) (Supp.2008).

Based on the evidence submitted at trial, the family court did not abuse its discretion in determining Father's gross

income. The evidence presented at trial and Father's own testimony revealed his 2001 financial declaration did not accurately reflect his gross income for that year. In his 2001 financial declaration, Father reported withdrawing an average of $3,600 per month from his law firm from January 1 through October 31. While this amount was accurate for the ten-month period, Father withdrew $17,000 from his law firm during the remaining two months of 2001. Thus, his total withdrawals from his law firm equaled $53,000 for 2001. His corporate income tax return revealed his law firm earned $66,372 for that same year. During cross-examination, Father admitted "the best documentation of my income for the year 2001 would be the preliminary tax returns that were prepared for the year 2001." For 2002, Father produced only a financial declaration as evidence of his gross income for that year. In that document, Father claimed to withdraw an average of $6,000 a month from his law firm from January 1 through August 31.

By the end of trial, a few things were apparent. First, by virtue of his testimony and the evidence presented at trial, Father vastly understated his gross income in his 2001 financial declaration. This fact necessarily called into question the veracity of his 2002 financial declaration. Second, the amount of money Father withdrew from his law firm in 2001, $53,000, represented about 80% of what he claimed to be his true gross income for that year, $66,372, as evidenced by his 2001 corporate income tax return. Third, Father's 2001 corporate income tax return served as the only credible evidence to demonstrate his gross income. Still, the family court was faced with the difficult task of determining Father's current gross income, and the only evidence depicting his gross income for the current year was his 2002 financial declaration. To determine Father's current gross income, the family court relied on the historical relationship between Father's 2001 withdrawals and his 2001 corporate income tax return. From this evidence, the family court determined Father's withdrawals amounted to only 80% of his actual gross income for that year (80% of $66,372 = $53,097.60). Thus, when Father claimed to withdraw an average of $6,000 a month from his law firm from January 1, 2002 through August 31, 2002, the family court, operating under the assumption that this amount

equaled only 80% of his income, concluded Father's gross income totaled $7,500 per month (80% of $6,000 = $7,500).

The family court relied on the lone piece of credible evidence, Father's 2001 financial declaration, in determining Fathers income for child-support purposes. We cannot conclude the family court abused its discretion in making this determination. *See Kelley,* 324 S.C. at 485, 477 S.E.2d at 729 (stating an abuse of discretion occurs when the court's decision is controlled by some error of law or where the factual findings are without evidentiary support). In addition, Father only provided the court with a financial declaration to evidence his current income for 2002. Father's testimony and the evidence presented at trial demonstrated his 2001 financial declaration understated his income for that year. Thus, the veracity of his 2002 financial declaration was also called into question.[10] As a result, Father's refusal to provide the family court with a meaningful representation of his current income precludes him from complaining of the family court's ruling on appeal. *See Patrick v. Britt,* 364 S.C. 508, 513, 613 S.E.2d 541, 544 (Ct.App.2005) (affirming the family court's determination of Father's income where he refused to provide the court with any meaningful representation of his current income). Lastly, even if the family court erred in determining Father's gross income, such error was caused by Father's failure to provide the court with accurate financial information. *See Cox v. Cox,* 290 S.C. 245, 248, 349 S.E.2d 92, 93 (Ct.App.1986) ("A party cannot complain of an error which his own conduct has induced."). Accordingly, we affirm the family court's decision to impute income to Father.

C. *Father's Expenses*

 Father argues the family court improperly added ordinary business expenses to his gross income. Specifically, Father claims the court erred in adding $7,884.37 worth of automobile expenses, $1,960 in parking expenses, and $2,400 in

---

10. This is not the first time Father has failed to provide candid financial information to the family court. During a hearing before the office of disciplinary counsel, Father acknowledged he did not make full financial disclosure when initially seeking a divorce from Mother. *See In re Barker,* 352 S.C. 71, 74, 572 S.E.2d 460, 461 (2002) (suspending Father from the practice of law for six months).

annual debt repayment from Daphne Burns to his gross income.

The court should count as income expense reimbursements or in-kind payments received by a parent from self-employment if they are significant and reduce personal living expenses, such as a company car, free housing, or reimbursed meals. S.C.Code Ann. Regs. 114–4720(A)(3)(c) (Supp.2008).

The family court correctly determined Father's vehicle expenses for 2001 totaled $7,884.37. Initially, Father contends he reported his vehicle expenses of $2,462.95 as gross income in his 2001 corporate income tax return; therefore, he asserts the family court erred in adding this amount back to his gross income. Father fails to cite to a specific page in his corporate income tax return to support his argument. Moreover, after reviewing the record, we have been unable to find where Father listed this amount as income on his tax return. Accordingly, we conclude this evidence does not appear in the record and cannot be considered on appeal. *See* Rule 210(h), SCACR (stating an appellate court may not consider a fact which does not appear in the record).

Next, Father argues his 2001 lease payments equaled $4,428, and his total vehicle expenses amounted to $7,037, not $7,884.37 as set forth by the family court. No evidence in the record shows the amount of lease payments paid by Father. Instead, Father has "automobile expenses" itemized as an expense in the amount of $7,884.37. Assuming Father is correct, automobile expenses, not just lease payments, paid by his law firm on his behalf would still qualify as in-kind income and would be subject to imputation as gross income. If the family court erred by using the term "lease payments" in lieu of the term "automobile expenses," the error is without consequence. *See McCall,* 294 S.C. at 4, 362 S.E.2d at 28 ("[W]hatever doesn't make any difference, doesn't matter."). While Father's Form 2106–EZ indicates his total vehicle expenses for 2001 were $7,037, Father, in another piece of evidence, acknowledges his vehicle expenses for the same year totaled $7,884.37. In light of the contradictory evidence submitted by Father to the family court, we cannot conclude the family court erred in determining his vehicle expenses for 2001 equaled $7,884.37. Moreover, Father's Form 2106–EZ ap-

pears only as an attachment to his Rule 59(e) motion. Accordingly, it cannot be considered on appeal. *See Hickman v. Hickman*, 301 S.C. 455, 456, 392 S.E.2d 481, 482 (Ct.App.1990) ("A party cannot use Rule 59(e) to present to the court an issue the party could have raised prior to judgment but did not."). Therefore, the family court properly added $7,884.37 to Father's gross income.

■ However, the family court erred in adding Father's parking charges to his gross income. The record reveals Father's law firm spent $1,960 annually so he could park his car downtown near his office. Unlike an automobile, a parking space for work qualifies as an ordinary and necessary business expense and is properly deductible from the gross receipts of Father's business. *See* S.C.Code Ann. Regs. 114–4720(A)(4) (noting a self-employed parent's gross income for child support purposes equals gross receipts minus ordinary and necessary expenses required for business operation). Additionally, the family court erred in counting the $2,400 Father received from his former wife, Daphne Burns, as income. Father's amended financial declaration specifically notes this money was for repayment of a debt. We do not believe payment received in satisfaction of a debt qualifies as gross income under the child-support guidelines. On remand, these expenses should be deducted from Father's gross income, and the family court should recalculate child support pursuant to this order.

### D. *Reimbursement of Child Support Paid By Mother*

■ On cross-appeal, Mother argues Father understated his income at the temporary hearing before Judge Segars–Andrews in 2001. As a result, Mother claims Father should reimburse the $6,000 she paid in child support pursuant to the temporary order. We disagree.

Mother never raised a claim for retroactive reimbursement of child support at trial and presented this argument to the court for the first time during her post-trial motions pursuant to Rule 59 and Rule 60. Accordingly, Mother's arguments are not preserved for appellate review. *See Hickman*, 301 S.C. at 456, 392 S.E.2d at 482 ("A party cannot use Rule 59(e) to present to the court an issue the party could have raised prior to judgment but did not").

## IV. FEES

### A. *Guardian ad Litem Fees*

 Father argues the family court erred in relying on the Guardian's report and recommendation. Father contends the Guardian conducted her investigation in a biased manner. In addition, Father claims the Guardian's report was incomplete because it failed to include a custody recommendation. Because her report was flawed, Father contends the issue of Guardian's fees should be remanded to the family court. We disagree.

In *Patel v. Patel,* the Supreme Court of South Carolina set forth base-line standards a Guardian should follow in developing a recommendation to the family court. 347 S.C. 281, 288–89, 555 S.E.2d 386, 390 (2001). Pursuant to *Patel,* the Guardian shall:

> (1) conduct an independent, balanced, and impartial investigation to determine the facts relevant to the situation of the child and the family, which should include: reviewing relevant documents; meeting with and observing the child in the home setting and considering the child's wishes, if appropriate; and interviewing parents, caregivers, and others with knowledge relevant to the case; (2) advocate for the child's best interests by making specific and clear recommendations, when necessary, for evaluation, services, and treatment for the child and the child's family; (3) attend all court hearings and provide accurate, current information directly to the court; (4) maintain a complete file with notes rather than relying upon court files; and (5) present to the court and all other parties clear and comprehensive written reports, including but not limited to a final report regarding the child's best interest, which includes conclusions and recommendations and the facts upon which the reports are based.[11]

*Id.*

Father's arguments are not preserved for appeal. While Father complained of the Guardian's bias during his testimo-

---

11. We note the statutory Guardian ad Litem guidelines only apply to guardians appointed on or after January 15, 2003. *Nasser–Moghaddas-*

ny, he never made a motion to relieve the Guardian of her duties based on bias.[12] *See Pye v. Estate of Fox,* 369 S.C. 555, 564, 633 S.E.2d 505, 510 (2006) (stating issues not raised and ruled upon in the trial court will not be considered on appeal). In addition, Father never asserted the Guardian's report was incomplete or otherwise objected to her report because it lacked a recommendation. *See Webb v. CSX Transp., Inc.,* 364 S.C. 639, 655, 615 S.E.2d 440, 449 (2005) (noting a contemporaneous objection is required to preserve issues for appellate review). Accordingly, these arguments are not preserved for appellate review. Therefore, we affirm the family court's award of fees to the Guardian.

### B. *Attorney's Fees*

Father argues the family court erred in awarding attorney's fees to Mother. In the alternative, Father asserts that the amount of attorney's fees awarded were excessive. We disagree.

"The award of attorney's fees is left to the discretion of the trial judge and will only be disturbed upon a showing of abuse of discretion." *Upchurch v. Upchurch,* 367 S.C. 16, 28, 624 S.E.2d 643, 648 (2006). In awarding attorney's fees, the court should consider each party's ability to pay his or her own fee, the beneficial results obtained by the attorney, the parties' respective financial conditions, and the effect of the fee on each party's standard of living. *E.D.M. v. T.A.M.,* 307 S.C. 471, 476–77, 415 S.E.2d 812, 816 (1992). In determining the amount of attorney's fees to award, the court should consider the: (1) nature, extent, and difficulty of the case; (2) time necessarily devoted to the case; (3) professional standing of counsel; (4) contingency of compensation; (5) beneficial results obtained; (6) customary legal fees for similar services. *Glasscock v. Glasscock,* 304 S.C. 158, 161, 403 S.E.2d 313, 315 (1991).

---

*si v. Moghaddassi,* 364 S.C. 182, 193–94, 612 S.E.2d 707, 713 (Ct.App. 2005). The Guardian in this case was appointed on November 13, 2001. Consequently, *Patel* and its progeny control.

12. Father's lone motion to relieve the Guardian was on the basis of her move to Washington.

■ The family court did not err in awarding $43,675 in attorney's fees to Mother. Contrary to Father's assertions, Mother obtained beneficial results both at the temporary hearing and at trial. At the temporary hearing, Judge Segars–Andrews reduced Mother's child support payments by 50% and awarded her overnight visitation with the children one day a week and on every other weekend. Before the temporary hearing, the visitation schedule in effect was established based on Mother's residence in Nashville. Consequently, the visitation schedule did not allow Mother to see the children on a weekly basis. At trial, Mother received additional beneficial results in gaining joint physical custody of the children, primary legal custody of the children, and child support from Father.[13] Accordingly, Mother obtained beneficial results at trial.[14]

■ Next, Father contends the amount of attorney's fees awarded were excessive in light of his income. Typically, we would be very concerned by an award of attorney's fees representing approximately 40% of Father's annual income. *See Rogers v. Rogers*, 343 S.C. 329, 334, 540 S.E.2d 840, 842 (2001) (reversing the family court's award of attorney's fees where the award represented 16% of Mother's annual income, and some of the beneficial results obtained by Mother in the litigation were reversed on appeal). However, in this case, the family court based its award of attorney's fees, not only on the factors set forth in *Glasscock*, but also on Father's uncooperative conduct in discovery and his evasiveness in answering questions with respect to his financial situation. A review of the record reveals that Father's uncooperative conduct greatly

---

13. On appeal, Father claims Mother failed to obtain beneficial results at trial because she received no more than Father offered in settlement negotiations—joint physical custody of the children. While we disagree with Father's argument, we also note that statements made during settlement negotiations are inadmissible. *See* Rule 408, SCRE ("Evidence of conduct or statements made in compromise negotiations is likewise not admissible.").

14. In addition, we note that this controversy between Mother and Father developed into a highly contentious litigation. In the end, the trial lasted for five full days. During this time, twenty-one witnesses were called, and sixty-four exhibits were presented to the court.

contributed to the litigation costs associated with this action. During discovery, Father failed to respond to basic requests for production of documents on two occasions. In both instances, Father's obstructionist tactics caused Mother to incur the unnecessary expense of drafting motions and attending court proceedings. To compound matters, Father gave evasive answers to questions about his finances. At one point during cross-examination, Father answered that he could not remember how much money he withdrew from his law firm in 2001. Taking into account that Father's uncooperative conduct greatly increased the cost of litigation, we affirm the family court's award of $43,675 in attorney's fees to Mother. *See Donahue v. Donahue*, 299 S.C. 353, 365, 384 S.E.2d 741, 748 (1989) (holding husband's lack of cooperation serves as an additional basis for the award of attorney's fees); *Anderson v. Tolbert*, 322 S.C. 543, 549–50, 473 S.E.2d 456, 459 (Ct.App. 1996) (noting an uncooperative party who does much to prolong and hamper a final resolution of the issues in a domestic case should not be rewarded for such conduct).

## V. RELIEF FROM DISCOVERY/EX PARTE ORDERS

Mother asks us to vacate discovery orders from seven years ago, and an ex parte order, which Father and the judge who issued it, acknowledge is moot. We decline to do so because such an order from this court would have no practical legal effect. *See Byrd v. Irmo High Sch.*, 321 S.C. 426, 431, 468 S.E.2d 861, 864 (1996) (noting an issue becomes moot when a decision, if rendered, will have no practical legal effect upon the existing controversy). Accordingly, the decision of the circuit court is

**AFFIRMED IN PART, REVERSED IN PART, and REMANDED.**

PIEPER, J., and LOCKEMY, J., concur.