541 S.E.2d 273

**Tom Drake KISLING, Respondent,**

v.

**Donna Joan ALLISON, Appellant, and David Allison and Yvette Kisling, Third Party Defendants.**

**No. 3277.**

Court of Appeals of South Carolina.

Heard Dec. 12, 2000.

Decided Jan. 2, 2001.

---

Adam Fisher, Jr., of The Fisher Law Firm, of Greenville, for appellant.

Timothy E. Madden, of Wilkins & Madden, of Greenville, for respondent.

ANDERSON, Judge:

Donna Joan Allison ("Mother") appeals an order of the Family Court transferring custody of her daughter, Jessica Lynn Kisling,[1] to Tom Drake Kisling ("Father"). We affirm.

## FACTS/PROCEDURAL BACKGROUND

Mother and Father were divorced in May 1994. Pursuant to an earlier Family Court order and written agreement of the parties, Mother was granted custody of Jessica.

In April 1997, Father filed an action to modify visitation and child support. Father additionally requested the appointment of a guardian ad litem for the benefit of Jessica. In June 1998, after the guardian's investigation, Father amended his complaint to request custody of Jessica, alleging a substantial and material change in circumstances.

## STANDARD OF REVIEW

On appeal from the Family Court, this Court has jurisdiction to find the facts in accordance with its view of the preponderance of the evidence. *Murdock v. Murdock*, 338 S.C. 322, 526 S.E.2d 241 (Ct.App.1999). This tribunal, however, is not required to disregard the Family Court's findings. *Badeaux v. Davis*, 337 S.C. 195, 522 S.E.2d 835 (Ct.App.1999). Neither are we mandated to ignore the fact the Family Court judge, who saw and heard the witnesses, was in a better

---

1. Jessica was born December 12, 1991.

position to evaluate their testimony. *Smith v. Smith,* 327 S.C. 448, 486 S.E.2d 516 (Ct.App.1997). Concomitantly, because the appellate court lacks the opportunity for direct observation of witnesses, it should give great deference to the Family Court's findings where matters of credibility are involved. *Dorchester County Dep't of Soc. Servs. v. Miller,* 324 S.C. 445, 477 S.E.2d 476 (Ct.App.1996). This is especially true in cases involving the welfare and best interests of children. *Id.; see also Cook v. Cobb,* 271 S.C. 136, 245 S.E.2d 612 (1978) (the welfare and best interests of children are the primary, paramount, and controlling considerations of the court in all child custody controversies).

## ISSUE

Did the Family Court err in finding changed circumstances existed that warranted the transfer of custody to Father?

## LAW/ANALYSIS

### CUSTODY

In South Carolina, in custody matters, the father and mother are in parity as to entitlement to the custody of a child. When analyzing the right to custody as between a father and mother, equanimity is mandated. We place our approbation upon the rule that in South Carolina, there is no preference given to the father or mother in regard to the custody of the child. The parents stand in perfect equipoise as the custody analysis begins.

Mother argues the Family Court abused its discretion in granting Father custody of the child. She maintains there was no substantial change of circumstances materially affecting Jessica's welfare. We disagree.

*Shirley v. Shirley,* 342 S.C. 324, 536 S.E.2d 427 (Ct.App.2000), articulates, with specificity, the general rules governing change of custody cases:

> In all child custody controversies, the controlling considerations are the child's welfare and best interests. In reaching a determination as to custody, the family court

should consider how the custody decision will impact all areas of the child's life, including physical, psychological, spiritual, educational, familial, emotional, and recreational aspects. Additionally, the court must assess each party's character, fitness, and attitude as they impact the child. There exist no hard and fast rules for determining when to change custody and the totality of the circumstances peculiar to each case constitutes the only scale upon which the ultimate decision can be weighed.

In order for a court to grant a change of custody based on changed circumstances, the party seeking the change must meet the burden of showing changed circumstances occurring subsequent to the entry of the order in question. A change in circumstances justifying a change in the custody of a child simply means that sufficient facts have been shown to warrant the conclusion that the best interests of the child will be served by the change. The change of circumstance relied on for a change of custody must be such as would substantially affect the interest and the welfare of the child, not merely the parties, their wishes or convenience. The circumstances warranting a change in custody must occur after the date of the original custody order. Custody decisions are matters left largely to the discretion of the trial court. Furthermore, the appellate court should be reluctant to substitute its own evaluation of the evidence on child custody for that of the trial court.

*Id.* at 330, 536 S.E.2d at 430 (citations and quotation marks omitted).

 Mother and Father have both remarried.[2] While the parents' new relationships have impacted this case, the circumstances warranting a change of custody began soon after Mother and Father divorced.

## I. Mother's Circumstances

### A. Mother's Judgment

Mother has exercised poor judgment regarding Jessica's best interests and welfare. Shortly after her divorce from

---

2. David Allison ("Step–Father") and Yvette Kisling ("Step–Mother") were named as third party defendants in this action.

Father, Mother and Jessica resided with a man named Chad Brannon. Mother was not married to Brannon; however, she engaged in a sexual relationship with him while Jessica was in the home. Mother testified she terminated her relationship with Brannon because she felt "guilty" and knew "it was not the right thing to be doing."

Nevertheless, Mother again employed a lack of good judgment when she and Jessica moved in with Step–Father before Mother married him. Mother testified she thought she was putting Jessica first when deciding to live with Step–Father. When asked at the custody hearing whether she put Jessica first when she engaged in sexual relations while her daughter was in the next bedroom, Mother stated: "Well, I didn't think about Jessica when I thought about sex. So, I feel like I always put Jessica first, yes."

Mother's imprudent judgment has extended into Jessica's school attendance. Jessica has had excessive absences and tardies while in Mother's care. Many of these absences and tardies have been un-excused. Mother explained one absence to Father by stating Jessica stayed home from school because she had not done her homework. At trial, Mother testified some of the other absences and tardies were caused by "some counseling sessions that interfered with school."

## B. Mother's Home Life

Mother's relationship with Step–Father is not stable. They have separated twice—once before they married and once after. During the first separation, Step–Father attempted to commit suicide. Step–Father has "flashes of anger and . . . uses inappropriate words and actions around Jessica." Mother has stated she is not comfortable leaving Jessica alone with Step–Father because of his temper, inability to get along with Jessica, and lack of parenting skills. Mother and Step–Father have had many arguments, mostly about Jessica. On one occasion, their argument became violent—Mother slapped Step–Father and the police were summoned. Step–Father admitted Mother is "emotional," "moody," and "high-strung." He additionally testified she is a loud talker and has a quick temper.

In addition to Jessica, Mother and Step–Father have two young daughters. The family resides in a rented three-bedroom home. Living space is limited—Jessica and Kendall, her oldest half-sister, share a bedroom. At the time of the custody hearing, it was the fifth home Mother and Jessica had lived in since 1993.

A child's regular attendance in a house of worship arguably suggests the child lives in a home where moral development is fostered. Regarding the spiritual climate in Mother's home, Mother and Step–Father are members of a church; however, Step–Father testified the family's attendance "varies."

### C. Mother's Attitude Toward Father and Step–Mother

Mother began exhibiting hostility toward Father when he and Step–Mother began dating seriously and got married. Mother's own expert witness, Dr. Joanne Armstrong,[3] testified Mother is consumed with anger toward Father and Step–Mother. Mother does not handle visitation exchanges well. She has quarreled with Father in Jessica's presence, where she called him a liar, cursed at him, and threatened to sue him for sexual harassment.

Mother's problems with Step–Mother have also been extreme. Mother admitted feeling intimidated by Step–Mother's relationship with Jessica. Mother insisted Step–Mother not engage in activities with Jessica such as cooking, fingernail painting, and bathing. She once accused Step–Mother of being evil, deceitful, and trying to take Jessica away from her. Mother has threatened Step–Mother and once issued a trespass notice against her. Based upon this Court's review of the record, Step–Mother does not appear to be the source of these difficulties. Mother says she is no longer shaken by Step–Mother's presence and influence, but admittedly does nothing to encourage Jessica's relationship with her.

Additionally, there is evidence that Mother has discouraged Jessica from visiting Father. In some instances, Mother

---

3. Dr. Armstrong is a psychologist who counseled Jessica, Mother, and Father pursuant to the court appointed psychologist's recommendation and a consent order filed on September 23, 1998. Dr. Armstrong testified she did not believe there was a "substantive reason" for a change of custody.

emotionally manipulated Jessica by allowing Kendall to call Jessica at Father's to tell her she misses her. Mother has attempted to limit Father and Step–Mother's access to Jessica at school functions, publicly insisting Jessica spend time with her rather than them. These episodes clearly show Mother is daunted not only by Step–Mother's relationship with Jessica, but by Father's relationship with her as well.

### D. Affect on Jessica

Although by all accounts Jessica is a bright child with good grades, the tension between Mother's and Father's households has affected her. When Mother is stressed, Jessica is stressed as well. Jessica is very sensitive in reacting to problems between her parents. She has suffered nightmares, stomachaches, and headaches following their disagreements. Father testified Jessica has become upset and depressed after she has received phone calls from Mother or Kendall. During a counseling session, Jessica described to Dr. Armstrong fun things she liked to do at each home, but asked the counselor not to tell the other parent. Dr. Armstrong surmised that Jessica is "very protective of her parents' feelings" and did not want to hurt them.

Dr. Greg Horn, a psychologist appointed by the court to perform psychological evaluations on Jessica and her parental figures, reported Jessica, a naturally anxious child, has developed "separation" problems in being apart from Mother. These difficulties are primarily the result of Mother's behavior and the messages Mother sends concerning the distress she has in being away from Jessica. Mother has promoted this separation anxiety. Mother described visitation exchanges where both she and Jessica were crying. Jessica feels the need to take care of Mother and worries about her while visiting with Father.

### II. Father's Circumstances

### A. Father's Judgment

Father has exercised better judgment concerning Jessica's best interests. Approximately six months after the divorce, Father became acquainted with Step–Mother at church and

began dating. Unlike Mother, he chose not to expose Jessica to his new relationship. Step–Mother recalled:

> He told me [about Jessica] the very first night we talked. He said that he had been in a divorcé Sunday school and said that I have a daughter and she's three years old.... And as we started dating he said, you know, she comes first in my life and she's the most important thing to me. So I don't—I've never introduced her to anyone and I'm not going to introduce her to you.

Jessica and Step–Mother met only after Father and Step–Mother became serious, which was approximately six months into their relationship.

## B. Father's Home Life

Unlike Mother and Step–Father, Father and Step–Mother have a good and stable relationship. They have never separated or experienced marital difficulties.

In the Mother's home, Jessica shares a room with one of her half-sisters. She has her own bedroom in Father and Step–Mother's new home. Father and Step–Mother's schedules permit them to spend much quality time with Jessica. Father and Step–Mother are active members and leaders of their church. Father is a deacon in the church. Step–Mother teaches Jessica's Sunday School class. They stimulate Jessica's spiritual development by encouraging daily Bible reading and devotionals.

Jessica and Step–Mother have a good relationship. Step–Mother testified she has no intention of trying to take over Mother's role. Step–Mother is good with children and enjoys reading with and telling stories to Jessica.

## C. Father's Attitude Toward Mother and Step–Father

Father encourages Jessica's relationship with Mother and Step–Father. Father contended at trial he does not disparage Mother or Step–Father to Jessica or in her presence. He professed he wants Jessica to have a loving and mature relationship with Mother and that he does not desire to impede that relationship.

### III. Guardian ad Litem's Recommendations

Although Dr. Armstrong stated she did not see a need for a change of custody, the guardian ad litem appointed to represent Jessica's best interests recommended the court transfer custody of Jessica to Father. The guardian averred that in making recommendations, he looks at what is in the child's best long term interests. He concluded Father has the more stable home and marriage. By contrast, he saw Mother as volatile. She treated visitations as crises and thought arguments in front of Jessica were "no big deal."

A guardian ad litem is a representative of the court appointed to assist it in properly protecting the interests and welfare of an incompetent person. *Shainwald v. Shainwald,* 302 S.C. 453, 395 S.E.2d 441 (Ct.App.1990). The role of the guardian in making custody recommendations is to aid, not direct, the court. *Dodge v. Dodge,* 332 S.C. 401, 505 S.E.2d 344 (Ct.App. 1998). The custody decision lies ultimately with the Family Court judge. *Clear v. Clear,* 331 S.C. 186, 500 S.E.2d 790 (Ct.App.1998).

The court accepted the guardian's recommendations and agreed with them. However, the Family Court made its own assessment of what was in Jessica's best interest.

### CONCLUSION

While in her custody, Mother has exposed Jessica to inappropriate moral surroundings and an unstable home environment. Jessica's absences and tardies suggest Mother has not prioritized the child's life properly. Jessica has been permitted to experience several negative interactions between Mother and Father and Step–Mother. Mother has additionally thwarted Jessica's independence and development, discouraging her from building relationships with Father and Step–Mother.

By contrast, Father has not placed Jessica in any immoral settings. He put Jessica's needs before his own when he began his relationship with Step–Mother. He offers Jessica a more stable environment than Mother. Father is more capable than Mother of acting in Jessica's best interest. He promotes Jessica's independence, while encouraging her relationship with Mother and Step–Father. Finally, Father and

Step–Mother have taken an active role in Jessica's spiritual development.

Father has demonstrated sufficient facts to warrant the Family Court's conclusion that Jessica's best interests will be served by the change of custody. The Family Court did not abuse its discretion. Accordingly, the Family Court's order, awarding Father custody is

**AFFIRMED.**

HEARN, C.J. and STILWELL, J., concur.