722 S.E.2d 225

**Paul David PURSER, Respondent,**

v.

**Angela Renee OWENS, Appellant.**

**No. 4898.**

Court of Appeals of South Carolina.

Heard April 5, 2011.

Decided Oct. 26, 2011.

Rehearing Denied March 7, 2012.

Michael J. Anzelmo, and John D. Shipman, both of Greenville, for Appellant.

James B. Tucker, Jr., of Rock Hill, for Respondent.

Charlotte Mooney, of Lancaster, Guardian ad Litem.

KONDUROS, J.

Angela Owens (Mother) appeals the family court's award of custody to Paul Purser (Father). We affirm in part, reverse in part, and remand.

## FACTS

Mother and Father are the parents of an autistic child (Child) who is now eleven years old. Mother and Father's relationship has never been stable. They never married and never lived together on a regular basis.[1] They dated on and off for about two years and finally stopped seeing each other when Mother became pregnant with Child. Father raised the possibility of whether to have the Child or terminate the pregnancy. Mother elected to have Child, and he was born on

---

1. It appears the parties may have stayed together periodically, but Father always retained a separate residence.

October 1, 1999. Father had not been actively involved in the pregnancy, but attended the birth and, afterwards, moved to Lancaster, South Carolina, where Mother lived, "to try to make it work." A few months later, Father moved permanently to Charlotte, North Carolina. Father claims that Mother gave him a choice of being with her and seeing Child or not seeing Child at all. However, Father's mother was allowed to see Child, and he arranged to see Child through her occasionally. He voluntarily paid child support in the amount of $75 to $150 per week from the time of Child's birth.

In May 2004, Child was diagnosed with autism by Mae Baird, a regional consultant with the Department of Developmental Services autism division. Father was initially reluctant to accept Child's autism diagnosis. At the custody hearing, both Dr. Carmena Cruz, Child's pediatrician, and Baird testified denial is a normal reaction for some parents. Mother left her job as an internet manager at a car dealership in 2004, after the initial diagnosis, to devote her time to caring for Child. Dr. Cruz testified that caring for an autistic child can be overwhelming for parents, especially a single parent. Dr. Cruz explained that because change is difficult for an autistic child, a stable, consistent environment is the most important thing to provide. Similarly, Baird testified that "autistic individuals have a lot of problems with routine changes," and change "can produce a lot of problem behaviors because [they] don't understand perhaps what is happening around them or what is expected of them."

After filing for custody in September 2005, Father remarried and attempted to become regularly involved in Child's life. Until then, Father's visitation with Child had been irregular. However, by the time of the hearing, Father attended Child's school meetings, visited his doctors, and enrolled him in a therapy program. He also generally had visitation with Child every other weekend.

In 2006, when Mother was thirty-five years old, she briefly dated a nineteen-year-old man (Boyfriend) with a prior marijuana conviction. Boyfriend spent the night in Mother's home, arriving after Child was asleep and leaving before he awoke.[2] According to Mother, Boyfriend was around Child

2. Boyfriend came to Mother's house drunk one night and broke her car window because she danced with another man. Boyfriend subsequent-

"maybe two or three weekends." Mother became pregnant with Boyfriend's child and had an abortion. She testified she chose to abort the pregnancy because this child had a fifty-percent chance of being autistic, she felt a second child would take away her focus from Child, and Boyfriend was not someone she wanted involved in her and Child's lives anymore.

Mother still lives in Lancaster and has been Child's primary caretaker for his entire life. She is unmarried, and Child is her only child. She works from her home as a real estate marketer. While Child lived with Mother, he received speech therapy, occupational therapy, and Applied Behavior Analysis (ABA) therapy in school.[3] He received some additional therapy after school as well.

Mother argued Father filed this custody case because she sought a child support order. She testified Father served her with custody papers within days of being contacted by the Department of Social Services about child support payments. Father denied this and said he filed because he did not "believe the medical avenues are being followed up diligently like they should be for Child.... [T]here's an element of danger in the environment that's around [him]."

On March 18, 2008, the family court awarded custody to Father. The family court found Mother was Child's primary caretaker and both parties presented as fit parents with appropriate households. However, the family court expressed concerns about Mother's combativeness with school officials, her lack of access to more therapy for Child, and her lack of judgment. The family court stated:

---

ly broke the car window of a man with whom he had seen Mother having dinner.

**3.** According to the Department of Disabilities and Special Needs, ABA therapy is the process of "systematically applying interventions to improve socially significant behaviors.... Socially significant behaviors include reading, social skills, communication, and adaptive living skills. Adaptive skills include gross and fine motor skills, eating and food preparation, toileting, personal self-care, and home and community orientation." *Pervasive Developmental Disorder Waiver/State Funded Program Manual for Case Managers and Early Intensive Behavioral Intervention Providers, available at* http://ddsn.sc.gov/providers/medicaidwaiverservices/pdd/.

Other things I'm concerned about is the pregnancy with a 19 year old and abortion. That was an irresponsible decision; two irresponsible decisions. First being involved with a 19 year old when you are 36 or 35. That's irresponsible. And then having an abortion. That's irresponsible. I am concerned about the environment.

The family court concluded Father was the parent best equipped "to bring about the most adjusted and mature ... child." Visitation was structured so that Mother would have Child every other weekend as well as every other Tuesday after school and every Thursday after school. This appeal followed.

## STANDARD OF REVIEW

■ We review the family court's decision de novo. *Lewis v. Lewis*, 392 S.C. 381, 392, 709 S.E.2d 650, 655 (2011).

## LAW/ANALYSIS

### I. Totality of Circumstances Versus Change of Circumstances

■ Mother contends the family court erred in utilizing a totality of the circumstances standard in this case instead of requiring Father to demonstrate a change in circumstances. She maintains the custody of an illegitimate child in the natural mother, as provided for in section 63–17–20(B) of the South Carolina Code (2010) (formerly section 20–7–953(B)),[4] coupled with Father's failure to pursue custody of Child sooner, demonstrate an established custody agreement that should have been recognized by the family court. We disagree.

In *Altman v. Griffith*, 372 S.C. 388, 642 S.E.2d 619 (Ct.App. 2007), this court addressed Mother's first point. In *Altman*, the mother argued section 20–7–953(B), gave her an advan-

---

4. The newer version of the statute is identical to the former statute. Both provide that "[u]nless the court orders otherwise, the custody of an illegitimate child is solely in the natural mother unless the mother has relinquished her rights to the child. If paternity has been acknowledged or adjudicated, the father may petition the court for rights of visitation or custody in a proceeding before the court apart from an action to establish paternity." § 63–17–20(B).

tage over the father in the custody determination, which required him to demonstrate a change in circumstances to gain custody. *Id.* at 397, 642 S.E.2d at 624. The court stated:

> In giving a father the right to petition the family court for custody, the statute makes no mention of a change of circumstances burden. This plain reading of the statute is in accord with the general legal principle that the imposition of a change of circumstances burden applies when a parent seeks to alter a prior custody *order.*

*Id.* (emphasis added).

 While the statute does place custody of a child of unmarried parents with the mother, the statute simply clarifies the legal standing of the parties in the absence of a court-determined custody order should the matter of custody be called into question. Custody in the natural mother under this statute does not give her a legal advantage in a custody determination as it is well-settled that a mother and father stand in parity with one another as the custody analysis begins and in light of the abolition of the tender years' doctrine. *See Kisling v. Allison,* 343 S.C. 674, 678, 541 S.E.2d 273, 275 (Ct.App.2001) ("In South Carolina, in custody matters, the father and mother are in parity as to entitlement to the custody of a child."); *see also* S.C.Code Ann. § 63–15–10 (2010) ("The 'Tender Years Doctrine' in which there is a preference for awarding a mother custody of a child of tender years is abolished."). The statute establishes custody so the illegitimate child's societal needs can be met, such as enrolling in school, obtaining medical treatment, or being returned to the appropriate party should law enforcement or the child's school or daycare be required to elect between proper custodians.

We recognize the facts in this case are in some respects distinguishable from those in *Altman.* Father in this case did not seek custody of Child soon after the parties separated but waited until Child was almost six years old, and the parties never lived together. However, we do not believe those differences dictate a different reading or application of the statute than in *Altman.*

Mother also argues Father's inaction and reluctance to accept Child's autism diagnosis evidenced his acquiescence to

Mother's having custody of Child. She contends Father's conduct demonstrates the existence of an agreement between the parties regarding custody so that a change of circumstances burden should be imposed. We disagree.

The dissent is persuaded Mother's and Father's conduct evidences an agreement between them regarding custody of Child and under *Davenport v. Davenport*, 265 S.C. 524, 220 S.E.2d 228 (1975), a change in circumstances approach is therefore appropriate. However, in *Davenport*, Mother and Father had a written agreement regarding custody at the time of their separation. *Id.* at 526, 220 S.E.2d at 229–30. In this case, at no time did the parties have an explicit agreement, court-approved or otherwise. Without some definite agreement, the family court is left to attempt to ascertain the point in time when the actions of the parties gave rise to a de facto custody agreement. Only then could a court determine if the circumstances in existence at the time of the agreement had changed. This simply requires too much guesswork and speculation.[5]

In sum, *Altman* indicates the initial determination of custody between unmarried parents is measured by the totality of the circumstances, and a change in circumstance is only required to be demonstrated since the issuance of a court order. This framework ensures the best interests of the child have been considered by a neutral court and provides a date in time from which the family court can measure any alleged change in circumstances. Consequently, we conclude the family court did not err in examining the totality of the circumstances in reaching its decision.

## II. Award of Custody to Father

■ Mother argues the family court erred in considering her abortion when making its custody determination. We agree.

■ South Carolina law is clear that a parent's personal, moral behavior, while a proper consideration in custody cases

---

5. Because we do not believe an agreement existed in this case, we decline to address whether a change of circumstances approach is proper when the parties have established a custody agreement but not a court order.

is "limited in its force to what relevancy it has, either directly or indirectly, to the welfare of the child." *Davenport*, 265 S.C. at 527, 220 S.E.2d at 230. In this case, Mother's abortion had no direct or indirect effect on Child and therefore was not relevant to the custody determination. Thus, the family court should not have considered Mother's abortion in the custody analysis. Accordingly, we reverse the family court's order awarding custody of Child to Father and remand for consideration of the issue excluding Mother's abortion.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

THOMAS, J., concurs.

FEW, C.J., dissents.

FEW, C.J., dissenting:

I agree with the majority's holding that the family court improperly considered the mother's decision to have an abortion as part of the basis on which it awarded custody to the father. However, I believe the parents established a mutually agreed upon custody arrangement giving sole custody to the mother, a responsibility she fulfilled essentially unassisted for almost six years. Under these circumstances, this court's reasoning in *Altman v. Griffith*, 372 S.C. 388, 642 S.E.2d 619 (Ct.App.2007) required the father to prove a change in circumstances affecting the child's welfare before the family court could change the custody arrangement. Even pursuant to the majority's position, I would remand for a new trial and not permit the family court to simply reconsider without taking into account the abortion. Further, I would impose upon the father the burden of proving a change in circumstances before he may gain custody from the child's mother.

Paul Purser and Angela Owens dated on and off for two years. They stopped dating when Owens became pregnant with Purser's child. Purser attended the birth and afterwards moved from Charlotte, North Carolina, to Lancaster, where Owens lived, "to try to make it work." Purser testified that, after a short time, Owens gave him a choice of living with her or not seeing the child at all. Purser chose the latter, and before the child was three months old moved permanently

back to Charlotte. Purser admitted he rarely saw the child for the first six years of his life. He testified that from 1999 until September 2005, he "never had the opportunity to visit, to take [the child] to a doctor's appointment or anything like that."[6] The family court found that Purser had no contact with the child for eight months while Purser lived in Florida. Purser did not file for custody or even visitation until the child was almost six years old.

In all child custody cases, the welfare and best interests of the child are the primary considerations for a court in making the determination of which parent gets custody. *Patel v. Patel*, 359 S.C. 515, 526, 599 S.E.2d 114, 119 (2004). Whether the court makes that determination by considering the totality of the circumstances, or by requiring the noncustodial parent to show a change in circumstances, depends on whether custody is being decided for the first time. In an initial custody determination, no preference is given to either parent in their right to custody, and the judge must determine the best interests of the child under the totality of the circumstances. S.C.Code Ann. § 63–5–30 (2010); *Brown v. Brown*, 362 S.C. 85, 90–91, 606 S.E.2d 785, 788 (Ct.App.2004). However, once custody has been established and a parent later seeks to change the custody arrangement, he or she must prove a change in circumstances that occurred after the custody arrangement was established. *Spreeuw v. Barker*, 385 S.C. 45, 59, 682 S.E.2d 843, 850 (Ct.App.2009).

I recognize that in all but one instance in which our appellate courts have applied the change of circumstances burden to a party seeking a change in custody, the event establishing custody was the entry of a court order. *See Davenport v. Davenport*, 265 S.C. 524, 528, 220 S.E.2d 228, 231 (1975) (requiring proof of a change of circumstances to alter custody agreement reached by parties despite the fact the agreement was never incorporated into a court order). In *Spreeuw*, for example, this court stated, "the moving party must demonstrate changed circumstances occurring subsequent to the entry of the order in question." 385 S.C. at 59, 682 S.E.2d at 850. However, I do not believe a prior custody order is always

---

6. The quoted portion is from a question, to which Purser answered: "Correct."

required before a party seeking to change the custody arrangement will be required to prove a change of circumstances. In some situations, like *Davenport*, and like this case, the parties' custody agreement is a sufficiently established custody arrangement that may be changed only by showing a change of circumstances, even without a court order.

The majority is careful not to base its ruling on the requirement of a prior court order, but rather on its finding that "at no time did the parties have an explicit agreement, court-ordered or otherwise." I disagree with this finding. The agreement between Purser and Owens that Owens would have sole custody of this child could not have been any more explicit even if it had been in writing. Purser did not simply acquiesce in Owens' role as sole custodian of the child; rather, he insisted on it by refusing to fulfill his role as secondary caretaker for over five years. Moreover, on the facts of this case there is no uncertainty as to when the custody arrangement was established. Purser's decision to move to Charlotte before the child was three months old, leaving him in Owens' sole custody, established the arrangement. From that point forward, Purser and Owens had a mutually agreed upon, established custody arrangement under which Owens had sole custody and was the sole caretaker of the child. Under these circumstances, Purser should have been required to prove a change of circumstances in order to gain custody of the child.

The reasoning of *Altman* supports my position that the family court was required to apply the change of circumstances burden in this case. The mother and father in *Altman* never married. 372 S.C. at 394, 642 S.E.2d at 622. However, they lived together for approximately one year before their son was born, and they continued living together, although with many separations, for over three years afterwards. *Id.* During those three years, the parents shared custody of their son and neither parent sought any custody order in family court. *Id.* When they finally separated permanently, the mother took the child to live with her, but the father regularly attempted to see his son. *Id.* After only three months of permanent separation, the father filed an action in family court seeking custody. *Id.* The family court considered the totality of the circumstances, and granted

custody to the father. 372 S.C. at 395, 642 S.E.2d at 623. The mother appealed on the ground that the father should have been required to prove a change in circumstances, arguing only that section 63–17–20(B) [7] of the South Carolina Code (2010) required it. 372 S.C. at 397, 642 S.E.2d at 624 ("Mother's specific contention is that a statute concerning paternity, section [63–17–20(B) ], imposes on Father the burden of showing a substantial change of circumstances to gain custody.").

This court stated the issue as follows: "when parents are not married, does the law mandate a change of circumstances burden on every father who seeks custody?" *Id.* We answered the question "no," and gave three reasons. *Id.* First, we stated the statute did not mention a change of circumstances burden and our ruling was in accord with "the general legal principle that the imposition of a change of circumstances burden applies when a parent seeks to alter a prior custody *order.*" *Id.* (emphasis added). Second, our decision was "in line with" the "established rule" in custody matters that " 'the father and mother are in parity as to entitlement to the custody of a child.' " *Id.* (quoting *Brown,* 362 S.C. at 91, 606 S.E.2d at 788). Third, the court noted the parents lived together when the child was born and for three years thereafter, and therefore "[t]he family court *in this case* was presented with an initial custody determination." 372 S.C. at 397–98, 642 S.E.2d at 624 (emphasis added).

By framing the issue as whether "every father" must prove a change of circumstances, the *Altman* court contemplated the possibility that in a different factual situation it might be appropriate to impose the change of circumstances burden. I believe the facts of this case present such a different factual situation. To explain this, I address each of the reasons given for the decision in *Altman* in reverse order. Addressing the third reason from *Altman,* the family court in this case did not face "an initial custody determination" as we described in *Altman.* 372 S.C. at 397–98, 642 S.E.2d at 624. In contrast to the parents in *Altman,* who lived together for a year before the child was born and for over three years afterwards, Purser and Owens never lived together. In contrast to the three

7. Section 63–17–20(B) was previously codified at section 20–7–953(B) which contained identical language.

months separation in *Altman* before the father filed an action for custody, Purser waited almost six years to seek custody. During this time, Owens was not merely the primary caretaker, she was the sole custodian. Purser visited the child only sporadically, maintaining a "voluntary absence" from the child's life for as long as eight months on one occasion, according to the family court's order. By seeking no formal custody order, Purser knowingly allowed this to become the established custody arrangement. The father in *Altman,* on the other hand, was diligent in his efforts to see and gain custody of the child. This court explained:

> In an effort to see the child, Father called and wrote Mother "on a regular basis," but Mother avoided him. Rather than permit Father to see his son, Mother "directed [Father] to speak to my attorney." Father was denied any contact with his son until he filed this action in January 2003.

372 S.C. at 394, 642 S.E.2d at 622.

While the *Altman* father's efforts show he did not acquiesce in the mother having custody, Purser's lack of effort amounts to an agreement to the terms of custody and visitation imposed by Owens. As an example of the terms of the arrangement to which he agreed, Purser testified he could see the child only when Owens allowed him.

Q: So I don't understand what you're saying about she wouldn't let you visit with the child?

A: . . . I'm not saying [she never let me take him]. What I'm saying is it was her total decision and she was the total control over that. I may call after having plans to come get him and she would say, "I changed my mind. You're not going to get him."

. . .

Q: Did you ever go see an attorney about that?

A: No, sir, I didn't.

Q: You just sit back?

A: I did and I blame myself for that.

Years before Purser finally took action, he had his chance to ask the family court for an initial custody determination. He let the time for that lapse, however, through his intentional

absence from the child's everyday life. In contrast to the choice made by the father in *Altman* to immediately pursue custody, Purser made choices that resulted in an established, agreed-upon arrangement in which Owens had sole custody of the child.

The second reason from *Altman* is the legal principle that parents are in parity with each other regarding custody. 372 S.C. at 397, 642 S.E.2d at 624. This principle does nothing more than establish that there is no gender preference in custody disputes. *Kisling v. Allison,* 343 S.C. 674, 678, 541 S.E.2d 273, 275 (Ct.App.2001) ("When analyzing the right to custody as between a father and mother, [they must be treated equally]."). We also noted in *Kisling* that this parity exists "as the custody analysis begins." *Id.* This is illustrated by an examination of *Brown,* the case we cited in *Altman* as support for the principle of parity. In *Brown,* the custody determination occurred simultaneously with the divorce proceeding. 362 S.C. at 89, 606 S.E.2d at 787. Thus, the court considered the parents to be in parity at the first point in time when custody became an issue. We found the same situation to exist in *Altman* because "Mother and Father were living together when their child was born" and for three years afterwards, and the father sought custody only three months after the parents permanently separated. 372 S.C. at 394, 397, 642 S.E.2d at 622, 624. In this case, the same situation existed in 1999 when the child was born. At that point in time, Purser and Owens stood "in parity" because the issue of which parent would have custody had never before been in dispute. However, that parity became disparity as Purser consistently ignored his parental rights and duties for almost six years. The general rule that parents stand in parity to each other as the custody analysis begins does not apply when the noncustodial parent chooses to let six years elapse before taking action.

Addressing the first reason from *Altman,* which we described as "the *general* legal principle that the imposition of a change of circumstances burden applies when a parent seeks to alter a prior custody order," 372 S.C. at 397, 642 S.E.2d at 624 (emphasis added), this general principle does not require the existence of a prior custody order in every instance before a parent seeking custody must show a change of circum-

stances. Purser's request for custody was, in reality, a request to change an established custodial arrangement. On the facts of this case, the lack of a prior court order does not require an initial custody determination.

This is consistent with *Davenport*, which was recently cited by the supreme court in *Latimer v. Farmer*, 360 S.C. 375, 602 S.E.2d 32 (2004), as authority for the rule that before a court may "grant a change in custody, there must be a showing of changed circumstances occurring subsequent to the entry of the divorce decree." 360 S.C. at 381, 602 S.E.2d at 35. In *Davenport*, however, there was no decree establishing custody. The Davenports married in 1967, and separated by written agreement dated January 18, 1974. 265 S.C. at 526–27, 220 S.E.2d at 229–30. They had two children during the marriage, ages three and five at the time of separation. 265 S.C. at 525, 525 n. 1, 220 S.E.2d at 229, 229 n. 1. Pursuant to the separation agreement, the children were placed in the custody of their mother with liberal visitation given to the father. 265 S.C. at 526, 220 S.E.2d at 229–30. There is no indication in the opinion that the agreement was ever incorporated into a court order. After the parents separated, the mother moved from Greer, where the couple had lived together, to Spartanburg, where she set up a home and took a job as a school teacher. 265 S.C. at 527, 220 S.E.2d at 230. Within months, the father suspected the mother was hosting a male visitor overnight in the home with the children, which he was soon able to prove through the use of a private investigator. *Id.* On June 12, 1974, the father filed an action for divorce and a change in custody. 265 S.C. at 525–26, 525 n. 1, 220 S.E.2d at 229, 229 n. 1.

On appeal by the father from the circuit court's decision to leave custody with the mother, the supreme court first noted "the paramount consideration is the welfare of the child." 265 S.C. at 527, 220 S.E.2d at 230. The court then stated: "In cases, as here, where the parties have previously agreed as to whom should have custody, the party seeking to set aside the agreement has the burden of proving that the welfare of the children requires the agreement to be abrogated." *Id.* Despite no court order and the passage of less than five months from separation to the filing of the action seeking custody, the court required the father to bear the burden of proving why a

change should be made from the established custody arrangement. While the court did not use the term "change in circumstances," I believe the facts of the case, and particularly the supreme court's citation of *Davenport* in *Latimer*, demonstrate that a change in circumstances is precisely what the father was required to prove.

A comparison of the facts of *Altman* and *Davenport* supports my position that Purser should have been required to show a change in circumstances. The two significant similarities between the cases are that each father filed a custody action within months of separating from the mother and no previous court order establishing custody existed in either case. There are also differences between the cases. In *Davenport*, for example, the parties had been married for seven years and had two children born during the marriage. In *Altman*, the parties never married and thus their child was illegitimate. However, the difference in outcomes between the two cases did not turn on these differences. Rather, the different outcomes turned on the existence or nonexistence of an established custody arrangement. In *Davenport*, the supreme court found an agreement between the parents that had been in place for only five months was an established custody arrangement requiring the father to prove a change in circumstances. In *Altman*, on the other hand, the lack of any custody arrangement required the family court to make an initial custody determination based on the totality of the circumstances. Considering the facts of this case in light of *Davenport* and *Altman*, there is an even stronger case here for requiring "the party seeking to set aside the agreement [to bear] the burden of proving that the welfare of the children requires the agreement to be abrogated" than the supreme court had in *Davenport*. *Davenport*, 265 S.C. at 527, 220 S.E.2d at 230.

The majority states that without some "explicit" or "definite" agreement,

the family court is left to attempt to ascertain the point in time when the actions of the parties gave rise to a de facto custody agreement. Only then could a court determine if the circumstances in existence at the time of the agreement had changed. This simply requires too much guesswork and speculation.

Ascertaining the point in time when a custody arrangement becomes established may be difficult in some cases. However, it is not difficult on the facts of this case. The family court must simply answer: When did the parents mutually agree on the custody arrangement such that the arrangement became established? In general, the answer to that question is the point in time when both parents knew, accepted, and implemented the terms of the custody arrangement. Here, the custody arrangement became established at the point in time when Purser moved to Charlotte permanently and left the child in Owens' sole custody. At that point, both parents knew that Owens would have sole custody of the child, and that Purser would have limited visitation at best. From that point forward both parents' actions consistently demonstrated that they accepted and implemented the agreed upon custody arrangement.

I also disagree that we should be concerned about the potential difficulty of deciding when a custody arrangement becomes established. Courts should not shrink from difficult decisions. Further, concern over any such difficulty is minimal when compared to our true concern: the child's best interests. Where it applies, the change of circumstances burden protects those interests by promoting stability in the lives of children in established custody arrangements. Autistic children are particularly in need of this stability. Both the child's pediatrician and the Department of Disabilities and Special Needs consultant who diagnosed him with autism testified this stability is critical. An unwed mother like Owens, facing a fragile situation with an absent father, should not be required to sue him for the custody she already has in order to provide the stability her child needs in a custody arrangement. The majority's position that Purser may wait six years before seeking custody, and yet the court will treat it as an initial custody determination, imposes just that requirement.

I would reverse the change in custody and remand for a new trial, at which Purser would be required to prove a change in circumstances affecting the welfare of the child.