THIS OPINION
 HAS NO PRECEDENTIAL VALUE.  IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN
 ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.
THE STATE OF SOUTH CAROLINA
In The Court of Appeals

 
 
 
 Harold G.
 Hines, Jr., Respondent,
 
 
 

v.

 
 
 
 Kristen C.
 Hines, Appellant.
 
 
 

Appeal From Greenville County
 R. Kinard Johnson, Jr., Family Court
Judge

Unpublished Opinion No. 2012-UP-112  
 Heard December 6, 2011  Filed February
22, 2012

AFFIRMED

 
 
 
 Everett P. Godfrey, Jr., of Greenville,
 for Appellant.
 H. Michael Spivey, and Melissa D. Spivey, of
 Mauldin, for Respondent.
 Robert A. Clark, of Greenville, Guardian ad
 Litem.
 
 
 

PER CURIAM: In this family law action, Kristen C.
 Hines (Wife) appeals, arguing the family court erred in issuing a divorce
 decree without setting forth the specific findings of fact and conclusions of
 law that support the decision. Wife further contends the family court erred in
 awarding custody of the parties' children to Harold G. Hines, Jr. (Husband) as
 he has a history of violence and exposed the children to other women after he
 and Wife separated.  We affirm.
FACTS/PROCEDURAL HISTORY
Husband and Wife married in
 December 2001.  Two daughters (Children) were born of the marriage; T in 2004
 and H in 2005.  Around June 24, 2008, the parties separated following an
 altercation; the two struggled over Wife's bag of pills[1] and Wife hit her head on a doorframe.  Husband claimed he found Wife with a bag
 in which she kept drugs and while the two struggled over the bag, Wife hit her
 head on the doorframe.  Husband eventually let Wife have the bag and she
 snorted some crushed pills with a straw.  Wife claimed the altercation occurred
 because she told Husband she wanted a divorce; he grabbed her and dragged her
 outside, hitting her head on the wall and pushing her into the door jamb, and
 she snorted the drugs as part of a temper tantrum.  
Husband contacted the
 Greenville County Sheriff's Office.  Sergeant Chris Taylor, one of the officers
 who responded, counted Wife's pill bottle and discovered that 76 pills were
 missing from a 120-pill bottle of Lortab that was refilled four days prior. 
 The prescription called for her to take four pills a day.  Wife refused to go
 with EMS to be evaluated.  Wife told Sergeant Taylor that she had snorted the
 pills.  Wife also told Joshua Franseen with the Sheriff's Office she had
 snorted the pills, Husband had not abused her, and she was not fearful for her
 life.  Franseen informed Husband how to obtain an order of protection.  According
 to the Sheriff's Office report, the judge the officers called denied a warrant
 for criminal domestic violence.  Husband took Children to his father's home for
 the night.  Wife moved to Tennessee to live with her parents following the
 parties' separation.
On June 26, 2008, Husband
 filed a complaint for divorce on the statutory grounds of habitual drunkenness
 based on her use of prescription drugs and requested temporary and permanent
 custody of Children. Wife filed an answer and counterclaim on June 30, 2008,
 requesting a divorce based on physical cruelty and custody of Children.
On June 30, 2008, the family
 court held an emergency hearing due to Husband's motion for emergency temporary
 relief.  At the conclusion of the hearing, the court placed the children in the
 custody of the South Carolina Department of Social Services (DSS), finding
 based on the testimony and evidence presented, Children were in imminent and
 substantial risk of danger and must be removed from the physical custody and
 care of both Husband and Wife.  On July 1, 2008, DSS filed its pleadings.  The
 guardian ad litem (GAL) moved to have Children placed in Husband's parents'
 custody, and the family court granted the order on July 24, 2008.  The court
 issued an order on August 15, 2008, dismissing DSS's complaint and returning
 Children to Husband with alternating custody week to week by agreement of the
 parties.  In June 2009, Husband was given temporary primary placement of
 Children beginning on August 19 for T to begin attending school in Greenville
 County. 
At the beginning of the final
 hearing, Husband moved to amend his pleading to seek a divorce based on one
 year's continuous separation and Wife consented.  The parties also informed the
 family court they had settled all of their financial and property issues.
At trial, Husband testified
 that during the marriage, Wife stayed at home with Children and he worked
 full-time as well as attended school full-time.  He provided that when he would
 return home, he would "straighten the girls up, you know, spend time with
 them, get laundry started.  Either fix something to eat or go out and get
 something for us to eat, you know."  He indicated that Wife cooked
 occasionally, about once a week.  He stated "it wasn't like every night
 but she has cooked."  Husband provided he did all of his and Children's
 laundry, as well as the household linens and towels.  He testified he would
 change Children's clothing when he got home from work if they were dirty.  He
 also stated that when he was present, changing diapers was his responsibility. 
 He testified that he had completed a co-parenting class when Children were in
 DSS custody because it was required.
Husband provided that he has
 been able to take care of Children since he has had full-time custody.  He
 testified he gets T up in the morning and gets her ready for school.  He calls
 Ashley, his girlfriend, to come over and lets H sleep while he takes T to
 school.  He comes home from work, plays with Children, and takes them to the
 library, bowling, roller skating, or to dinner with his father.  On the
 weekends, they go to the park to ride bicycles.  In the evening, he helps T
 with her homework, which they spread out over the week.  On Wednesday and
 Sunday nights, Children go to programs at church, and on Sunday morning they
 attend church services.  He testified Children seemed to enjoy living with him
 in Greenville.  He provided that they have lots of fun and "they do really
 well." He said that although Wife claimed otherwise, H is "a well-behaved
 little four year old."
Husband testified Wife told
 him that her uncle sexually molested her as a child, and when she told her
 parents about it, her mother called her a "slut," and her father, who
 worked for DSS in Tennessee, did not do anything about it.  He also stated she
 told him about her grandfather touching her inappropriately.  He testified that
 as far as he knew, the uncle still lived in the same town as Wife's parents.  He
 also indicated that everyone who lives in Wife's parents' house who smokes does
 so in the house.  He admitted he smokes as well but does it on his back porch. 
 He further provided that during his marriage to Wife, Wife's brother beat her
 up while she was at her parents' house over an argument about her using drugs. 
 He testified Wife filed charges but her parents' bought her a Jeep and the
 charges were dropped.  Husband believed Wife's brother would regularly throw
 parties at their parents' house at which people would get drunk and pass out. 
 He also stated that when Children were taken into DSS custody, Wife gathered all
 of her and Children's possessions and took them to Tennessee.
Husband testified that after
 he separated from Wife, he dated a woman, Leanne, for a few months.  He stated
 Children had met her and her son at a park one time.  About three weeks after
 he stopped seeing Leanne, he began dating his current girlfriend, Ashley, who
 he intends to marry.  He indicated he introduced her to Children a few months
 later and about a month after that he found out she was pregnant with his
 child.  He provided that Ashley does not spend the night in his home when
 Children are present.
Husband did not believe he
 had an anger management problem.  He stated he had never abused Wife.  He admitted he had left small bruises on Children's bottoms from spanking
 them.  He said he now spanks them with his hand but he and Wife
 previously used a spatula.  He stated that he took anger management classes as
 a result of a recommendation from the GAL.  He provided that he learned some things
 in that class.  He also testified about an incident that occurred
 shortly before the hearing at which a process server came to his house at 6:30
 in the morning.  He stated that his dogs "were going absolutely
 crazy, which they seldom do unless something is wrong."  He
 testified that he saw a small car that he did not recognize and a person
 standing his front porch in "loose attire, didn't look
 professional."  He admitted that he opened his door and pointed a gun in
 the process server's face because he felt threatened.  He admitted that he
 currently has three pistols in his home.
Wife also testified at the
 hearing.  She testified that she currently lived with her mother and father at
 their home in Clarksville, Tennessee.  She stated she moved to Tennessee
 because her entire support system, her family and friends, is there.  She said,
 "It's where I grew up.  I know how to get around in Clarksville." 
 She indicated she lived in her parents' basement, which had a private access
 and was about 1,300 square feet.  She believed the space was suitable for her
 and Children.  She provided the home she has made for Children is 

 very
 large, very open, very fun.  We have a lot of kid's toys and we've got little
 areas set up for the children all over the house.  My area specifically is
 specifically set up for the children.  It's safe, it's very open, so they have
 plenty of play area.  They have their toys.  They have their own bedroom that's
 done all in princesses and it's very -- it's a very good environment for them. 

She testified the home was in
 the country so her parents had a lot of room for the farm animals they owned. 
 She planned for H to stay with her mother during the day and T to be at school
 when she went back to work.  Wife believed Children would be better off
 living with her because she had taken care of them since they were born.  She
 stated:

 I have
 been up all night with them.  I have been with them when they were sick.  I
 have changed their dirty diapers, wiped their snotty noses.  I have taught them
 their ABC's.  We were almost reading before this happened with [T].  We are so
 well-bonded and I mean they're my girls.  We're so close.  And I just think it
 would be a tragedy to take that away from either one of us.  

Wife admitted that three
 people who live in her parents' house smoke, including herself.  She also
 provided that her family has parties at their home on holidays but no one
 passes out from drinking.  She testified that people do smoke at their parties
 either in her father's shop area or outside.  She indicated she had not lived
 with her brother since they were children.  She also testified about a fight
 she and her brother had while she and Husband were married.  She was visiting
 Tennessee, and she and her brother got into an argument over a business deal
 that her brother and Husband made.  She said she pushed him and he pushed her
 back.  She admitted that he choked her and she bit his finger and stabbed him
 with her keys.  She provided that her brother's home is thirty miles away from
 her parents' house but he is currently in Afghanistan serving in the military. 
 She testified her parents had bought her a car after she dropped the charges
 against her brother but it was an "inspiration gift" so she could go
 back to school because Husband did not provide her with adequate
 transportation.  She dropped the charges against her brother because she did
 not want to prosecute him for something in which they were equally involved.
When asked about an uncle
 molesting her, she stated, "Technically he's not my uncle, he's a cousin
 that I -- he's so much older than me I called him uncle but he's my third
 cousin."  She indicated that she was eleven years old when the abuse
 occurred.  She stated that the abuse happened in her parents' home, where she currently
 lives.  She said the incident occurred when her extended family had gathered at
 the home due to an ice storm.  She provided that he lives twenty miles away
 from where she currently lives and he is not allowed anywhere she will be.  She
 stated although no court order required him to stay away, Tennessee has no
 statute of limitations for statutory rape and he knew that if he comes near
 her, she will press charges.  She testified that she would never allow Children
 to be around him.  
Wife also explained her
 mother called her a slut when she was seventeen or eighteen years old because
 she was acting promiscuously.  She then informed her mother she was
 being promiscuous because of the molestation, which her mother did not know
 about.  She stated that once she told her mother she was molested, her mother
 apologized and said she would talk to her father to decide what they should
 do.  She stated that her cousin was not arrested because her parents felt it
 would be more traumatic for her to sit through a court case and testify than it
 would be to let him know he would be prosecuted if he ever came around her or a
 young girl again.  She also indicated that her grandfather, who she said
 inappropriately touched her when she was two, was dead.  She indicated she did
 not tell her parents about that abuse until around the same time she told them
 about the other abuse and he was diagnosed with Alzheimer's shortly thereafter.
Additionally, Wife testified
 about her prescription drug problem.  She stated she injured her back in
 July 2001.  She testified she was diagnosed with fibromyalgia and had a disk in
 her back removed and it continued to degenerate.  She indicated she was
 prescribed medication typically reserved for cancer patients.  She
 became addicted to pain medication and forged a prescription to get more of
 it.  She testified she pled guilty to forging four prescriptions.  She
 attended several different clinics to treat her addiction.  She stated she eventually
 completed a program with honors.  Wife also testified she had been
 diagnosed with bipolar disorder and post-traumatic stress disorder and was
 receiving treatment for both.  She stated her treatment for bipolar
 disorder was to take a medicine called Abilify to keep her on an even keel.  She also sees a therapist once or twice a month for counseling and a
 psychiatrist once every four weeks.  She stated she was diagnosed as
 being bipolar after she sought counseling due to the incident between her and
 Husband. 
Additionally, Wife testified
 about the incident that occurred on the night of June 24, 2008.  She
 stated that she had just returned from Tennessee and decided that she wanted a
 divorce.  She informed Husband she wanted a divorce and locked him out
 of the room.  She then let him into the room because he was beating on
 the door and she was afraid he was going to wake Children.  She testified
 Husband said she must be high if she wanted to divorce him and he grabbed her
 bag containing Lortab[2] and Topamax[3].  She provided he pulled her around the corner as she was trying to get the
 bag back, causing her to hit her ribs and breast on the wall.  She
 stated that he dragged her down the hallway, which skinned the tops of her feet
 and knees.  He then handed her bag back to her and said "'You'll never
 divorce me.  You'll never get the kids.  I will use your drug addict, yourself,
 your past against you and you'll never get the kids.'"  Wife then
 told Husband, "'I'll show you drug addict and you can't do anything about
 it.'"  Wife then "got the paraphernalia and [she] crushed the pills
 up and snorted them in front of him."  Wife stated that after she
 finished, Husband pulled her back through the house, this time pulling her face
 into the door frame, knocking a tooth loose and fracturing her jaw.  She
 testified Husband called police and when they arrived, she told them she did
 not feel threatened because "'He's done now.  He's over it now.'"  Wife indicated she told the officers she did not have a drug problem
 because she "was throwing a temper tantrum basically."  She
 stated she did not want to go to the hospital because she did not want to leave
 Children but the officers had Husband take Children.
Wife testified Husband had
 hurt her before that night but had not been "quite that violent" in
 previous incidents; one time he had thrown her off the bed and thrown the
 mattress on top of her because one of Children would not stop crying.  She
 indicated that another time, he had raped her the night before she had to go to
 the hospital to have a procedure performed due to a miscarriage.  She did not
 believe Husband abused Children because he did not mean to bruise them but
 "sometimes he was overly excessive with his discipline.  [He] spanked the
 girls with a rubber hose so that it didn't leave marks and he spanked them with
 a spoon."  She further stated he spanked H eleven times with a
 spoon when she was fifteen months old.
T's teacher testified at the
 hearing as well.  She stated that T is on time, has perfect attendance, and is
 well-dressed.  She also indicated Husband had met with her and is a concerned
 father.  She provided T is a good student, is in the high group for reading,
 and comes prepared.
The court-appointed counselor
 also testified.  She provided that she had met with Children five times.  She believed Husband is an excellent father, provides a stable home, is
 very consistent, and provides structure.  She testified Husband is very
 appropriate with Children, loves them, and keeps them in line.  She
 noted that Children have good manners, are compliant, show affection towards
 Husband, and obey him well.  She recognized that Husband "makes
 mistakes like a lot of people do, but" she thought he had learned from his
 mistakes.
She further testified Wife
 was a good mother and loved Children as much as Husband did.  She
 indicated that Children are bonded to both Husband and Wife.  However, she
 noted Children have a lot of anxiety and "residual behaviors" when
 they return from visitation with Wife.  She stated Children have problems
 getting back into their routine when returning from visitation because
 Tennessee is in a different time zone and they stay up later when there.  She
 said that Children report they want to live with Wife because she does not put
 them in time out.  She also provided Children told her Wife told them to
 tell anyone who asked that they wanted to live in Tennessee.  The counselor
 noted that Wife had informed her she had behavioral problems with mostly H but
 also T and T reported that H misbehaves when in Tennessee.  The
 counselor indicated she did not have any concerns with Husband taking care of
 Children.  However, she did have concerns about Wife because she does
 not have a house or a job.  She further stated, "I worry about her
 ability to care for the children as far as parent them and set limits and
 boundaries and structure based upon her own report."  She explained
 that Wife had taken H to a counseling center in Tennessee and had reported to
 the center that H has tantrums, cries, pouts, and has headaches.  Wife also
 told the counselor T would be in "'super brat mode'" and H would act
 infantile.  The counselor stated Husband and Children had not reported
 any similar incidents while they were in Greenville.
The counselor believed
 both parents needed to continue to learn to work together but she believed the
 best placement for Children was with Husband.  She also believed T was
 doing well in school and was well-spoken.  She thought Husband's
 girlfriend, Ashley, was a good influence on Children.  She testified
 Ashley had not told her that she spent the night at Husband's house when
 Children were present, but she believed she did and had advised Husband against
 it because it violated a court order.  The counselor further provided
 Wife had been the primary caregiver during the marriage, with Husband providing
 "an enormous amount of support," particularly in terms of paying the
 bills while Wife stayed at home with Children.
The GAL's report was
 introduced and stated in part: 

 It was
 interesting to note that none of [Wife's] fifteen complaints about [Husband]
 [as to why he should not have primary custody] included the horrible criminal
 domestic violence alleged to have happened the night of June 24, 2008.  The
 evidence does not tend to support that [Husband] has been a physically abusive
 husband to [Wife] nor that [Husband] has abused the children by using excessive
 corporal punishment.  I have found evidence supporting [Husband] may have
 controlling behaviors and anger issues.  Husband pulled a gun on the process
 server recently.  

The GAL noted that Wife lives
 with her parents who she claims failed to protect her from sexual abuse from
 her grandfather and a cousin as a child.  Wife had stated that her
 mother blamed her for the abuse.  The GAL further provided that Wife
 suffers from both bi-polar and post-traumatic stress disorder.  The GAL
 also noted that Wife and her mother both smoke in the house. 
The family court also dealt
 with Wife's two contempt issues against Husband; Wife asserted he violated the
 court's orders by having (1) guns in the house and (2) his girlfriend overnight
 in the presence of Children.  The family court found Husband to be in contempt
 and as a sanction denied him attorney's fees.  At the conclusion of the
 hearing, the family court announced its decision on the issues, including
 custody.  The family court stated, "I take into consideration the
 Guardian's full report and [am] satisfied from all the evidence, including the
 Guardian's report . . . that the best interest of the children would be served
 by their being in the custody of their father."  When addressing
 visitation, the family court stated it did not think it was healthy to have
 children exposed to the smoking that went on at Wife's home in Tennessee and
 acknowledged the history of child abuse that had occurred there but found
 Children did not need any special restrictions while on visitation with Wife.  The
 family court further stated:

 I do
 think that both of these parents love these girls and would try to do what's
 best for them and I'm satisfied that the mother will not subject these children
 to a situation that would involve sexual abuse.  I do think that both of the
 parents probably expose them to smoke.  It's clearly not in their best
 interest.

Following the hearing, the
 family court issued an order awarding custody to Husband.  The order stated,
 "Though neither party came into this Court with 'clean hands,' the Court
 finds that custody of [Children] is granted to [Husband]."  This appeal
 followed.    

STANDARD OF REVIEW
The appellate
 court reviews decisions of the family court de novo.  Lewis v. Lewis,
 392 S.C. 381, 390, 709 S.E.2d 650, 654-55 (2011).  The appellate court
 generally defers to the factual findings of the family court regarding
 credibility because the family court is in a better position to observe the
 witness and his or her demeanor.  Id. at 390-92, 709 S.E.2d at 654-55. 
 The party contesting the family court's decision bears the burden of
 demonstrating the family court's factual findings are not supported by the
 preponderance of the evidence.  Id. at 392, 709 S.E.2d at 655.
LAW/ANALYSIS
Wife argues the
 family court erred in issuing a divorce decree without setting forth the
 specific findings of fact and conclusions of law that support the decision. 
 She contends the central issue at trial was custody of Children and the divorce
 decree does not set forth any specific findings of fact or conclusions of law
 to support the family court's decision to award Husband custody.  We agree.
Rule 26(a),
 SCRFC, provides that "[a]n order or judgment pursuant to an adjudication
 in a domestic relations case shall set forth the specific findings of fact and
 conclusions of law to support the court's decision."  See also Griffith
 v. Griffith, 332 S.C. 630, 646, 506 S.E.2d 526, 534-35 (Ct. App. 1998)
 (holding the family court must make specific findings of fact on the record for
 each of the required factors to be considered in making its decisions). 
 "However, when an order from the family court is issued in violation of
 Rule 26(a), SCRFC, the appellate court 'may remand the matter to the trial
 court or, where the record is sufficient, make its own findings of fact in
 accordance with the preponderance of the evidence.'" Griffith, 332
 S.C. at 646-47, 506 S.E.2d at 535 (quoting Holcombe v. Hardee, 304 S.C.
 522, 524, 405 S.E.2d 821, 822 (1991)); see also Bull v. Smith,
 299 S.C. 123, 126, 382 S.E.2d 905, 906-07 (1989) (holding an appellate court
 may independently review the record to make findings of fact when the family
 court's order fails to make such findings in compliance with Rule 26(a)); Bowers
 v. Bowers, 349 S.C. 85, 98-99, 561 S.E.2d 610, 617 (Ct. App.
 2002) ("[N]ot every violation of Rule 26(a) requires reversal[] . . . . Here, the record on appeal
 is sufficient for this Court to make necessary findings of fact relating to the
 award of attorney's fees."). 
After reviewing the entire
 order, we agree with Wife that the family court's order is lacking in regards
 to custody.  Nonetheless, the remedy for a lack of findings is either to remand
 or to make our own findings of fact if the record is sufficient.  The record is
 sufficient here for us to make our own findings of fact on custody.  
Wife contends the
 family court erred in awarding custody of Children to Husband.  We disagree.
In a child custody case, the welfare of the child and what is in the child's "'best
 interest is the primary, paramount, and controlling consideration of the court.'"  Davis v. Davis, 356 S.C. 132, 135, 588 S.E.2d 102, 103-04 (2003) (quoting Cook v. Cobb,
 271 S.C. 136, 140, 245 S.E.2d 612, 614 (1978)).  

 The family court considers several factors in determining the best
 interest of the child, including: who has been the primary caretaker; the
 conduct, attributes, and fitness of the parents; the opinions of third parties
 (including GAL, expert witnesses, and the children); and the age, health, and
 sex of the children. 

Patel v. Patel, 347 S.C. 281, 285, 555 S.E.2d 386, 388 (2001).  "In making custody
 decisions the totality of the circumstances peculiar to each case constitutes
 the only scale upon which the ultimate decision can be weighed."  Parris
 v. Parris, 319 S.C. 308, 310, 460 S.E.2d 571, 572 (1995).
"In South
 Carolina, in custody matters, the father and mother are in parity as to
 entitlement to the custody of a child."  Kisling v. Allison, 343
 S.C. 674, 678, 541 S.E.2d 273, 275 (Ct. App. 2001); see also S.C. Code
 Ann. § 63-15-10 (2010) ("The 'Tender Years Doctrine' in which there is a
 preference for awarding a mother custody of a child of tender years is
 abolished.").  "'The relative fitness of parents is an important
 issue in custody litigation. . . . Fitness decisions normally turn on either of
 two considerations; whether either parent has been the primary caretaker, or
 whether either parent has engaged in conduct which would affect the welfare of
 the child.'"  Brown v. Brown, 362 S.C. 85, 91, 606 S.E.2d 785,
 788 (Ct. App. 2004) (alteration by court) (quoting Roy T. Stuckey, Marital
 Litigation in South Carolina 433 (3rd ed. 2001)).  "'Although there is
 no rule of law requiring custody be awarded to the primary caretaker, there is
 an assumption that custody will be awarded to the primary caretaker.'"  Id. (quoting Patel v. Patel, 359 S.C. 515, 527, 599 S.E.2d 114, 120 (2004)).
In Divine v.
 Robbins, 385 S.C. 23, 33, 683 S.E.2d 286, 291 (Ct. App. 2009), the
 mother claimed the pivotal issue in determining custody was who to blame for
 the outbursts and altercations between the parties.   However, the family
 court's order considered the mother's behavior and the tumultuous nature of the
 parties' relationship as one of many factors in its decision, as is statutorily
 required in resolving custody issues.  Id. (citing S.C. Code Ann. § 63-15-40
 (Supp. 2008) (formerly S.C. Code Ann. § 20-7-1530) (stating that in making a
 decision regarding child custody, the family court must, in addition to other
 factors, give weight to evidence of domestic violence)).  Further, although a
 parent's morality is a proper factor for consideration, it is only relevant if
 it either directly or indirectly affects the welfare of the child.  Davenport
 v. Davenport, 265 S.C. 524, 527, 220 S.E.2d 228, 230 (1975).  "Custody
 of a child is not granted [to] a party as a reward or withheld [from a party] as
 a punishment."  Id.  
In support of her argument
 that the family court erred in awarding Husband custody, Wife points both to
 Husband's anger issues and that he introduced Children to women with whom he
 was involved.  Wife failed to show that Husband's relationships after their
 separation have impacted Children negatively.  Children's counselor believed
 that Ashley was a positive influence on Children.  Although Husband does seem
 to have some anger issues, they do not seem to be directed at Children.  In
 comparing the situation at his home to that at Wife's, his is the more
 desirable situation.  Both Children have lived in Greenville their entire lives
 and one is currently enrolled in school there.  Children have been living with Husband
 since the temporary order and are doing well there.  Wife indicates she has no
 intention of returning to Greenville but instead plans to remain in Tennessee. 
 The testimony presented indicates Children have many more behavioral problems when
 in Tennessee with Wife.  Based on our review of the record, we find the family
 court properly awarded Husband custody of Children.  Accordingly, the family
 court's decision is
AFFIRMED.
FEW, C.J., and THOMAS and KONDUROS, JJ., concur.

[1] Wife had previously battled a prescription drug
 habit.
[2] Lortab is used to relieve moderate to severe pain.
[3] Topamax is used to treat seizures in people with
 epilepsy.  It is also used to prevent migraines.